629 S.E.2d 653

**Linda ERICKSON, Appellant,**

v.

**JONES STREET PUBLISHERS, LLC, Respondent.**

No. 26133.

Supreme Court of South Carolina.

Heard Jan. 19, 2006.

Decided April 10, 2006.

Rehearing Denied May 24, 2006.

446

448

450

454

Russell S. Stemke, of Island Law Offices, of Isle of Palms, for Appellant.

John J. Kerr, of Buist, Moore, Smythe, & McGee, P.A., of Charleston, for Respondent.

Justice BURNETT:

Linda Erickson (Appellant) appeals the dismissal of her causes of action for defamation, invasion of privacy, and negligence against Jones Street Publishers, LLC (Newspaper). We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Newspaper publishes the Charleston City Paper, a free weekly newspaper with a circulation of about 30,000. Newspaper on January 19, 2000, published a front-page news story titled "In A Child's Best Interest: Is the guardian ad litem program giving children a voice?" In a promotional teaser in the table of contents on page three, Newspaper stated:

Protecting the Children

The Guardian Ad Litem program has come under fire recently for a series of transgressions. One high profile case has a Guardian reportedly becoming romantically involved with the father of a child. Critics claim volunteers with a lack of training and professional expertise have too much authority. How did this happen, and what is being done to remedy the situation?

In introductory paragraphs preceding the main body of the article, Newspaper stated:

Every child in the judicial system needs to have a voice. Parents have the benefit of experience, age, and lawyers to make their case. But what of a 7–year–old boy whose family is crumbling right in front of him and only sees himself to blame—who is to speak for him?

In South Carolina, they are called Guardian Ad Litems (GALs). In a perfect world, they provide an objective perspective for what's best for the child—mom's house, dad's house, neither. But what happens if their objectivity is compromised? What if, while carrying out their duties, they step across the line, like sleeping with the client's father?

It's already happened, and the result is a public effort to abolish half of the GAL system and radically modify the other half.

The article then began with a subsection titled "Whom to Believe?" In that first subsection, Newspaper recounted the claims of Pat Beal, a Summerville grandmother who said her daughter and two grandchildren had moved into her home to escape the daughter's physically abusive husband. Pat Beal said her "then six-year-old granddaughter began to complain of pain in her 'private area—vaginal pain'" and that "her granddaughter would cry out 'No, Daddy' in her dreams."

The family took the granddaughter to doctors to investigate "possible molestations," as well as to a lawyer who ultimately contacted the Department of Social Services, according to the article.

In the article, Pat Beal stated that "the [guardian] assigned to the case did not do a thorough job of interviewing the family and did not even talk to the granddaughter"; the guardian prevented an arrangement between the parents in which the mother (Pat Beal's daughter) would get full custody of the children; the guardian "manipulated the judge into barring [Pat Beal] from contacting her granddaughter without supervision"; and the guardian, in the final divorce decree, "had it written that she [Pat Beal] could have no contact with either of her minor grandchildren." Pat Beal further stated in the article that she "became incensed when a second psychologist said that she had 'coached' her granddaughter into alleging sexual abuse at the hands of her father"; that she and her husband had "spent $64,000 fighting the decree in court, and were eventually successful"; and that she had joined a court reform movement begun by those who have been through "equally harrowing experiences with custody and abuse battles."

The article did not name the guardian who represented Pat Beal's granddaughter. Appellant testified there were only a handful of private, non-lawyer guardians in Dorchester County at the time. Two local lawyers testified they and others involved in the Dorchester County family court system were familiar with the "Beal case," and knew Appellant was the guardian who had worked on it. Furthermore, it apparently is undisputed Appellant was sufficiently identified in the article because Newspaper did not attempt to defend on that ground.[1]

Appellant alleged the teaser, introductory paragraphs, and "Whom to Believe" subsection constituted defamation by libel. Appellant alleged and testified the false and defamatory statements included the charge she failed to properly investigate

---

1. The parties and witnesses often referred to "the Beal case," as it was commonly known. The divorce case was *William Litchfield v. Carla Litchfield,* who were divorced by an order filed April 13, 1998, about two years before the article was published.

the case or speak with the child she represented, that she improperly blocked and tried to prevent the mother from getting full custody of the children, that she manipulated a family court judge, that she caused a court order to be written preventing Pat Beal from having visitation with her granddaughter, and that she had a sexual relationship with the father of a child she represented.

Appellant presented evidence that the child's "vaginal pain" was actually caused by pinworms. Investigations by Appellant, DSS, physicians, and a psychologist revealed no evidence William Litchfield had sexually abused his daughter. Appellant testified she concluded Pat Beal had coached her granddaughter to falsely accuse her father of sexual molestation in order to gain an advantage in the divorce and custody battle. A psychologist reached the same conclusion. Appellant testified the child, unprompted, said she "told the doctor that my daddy did something that he really didn't. My nana [Pat Beal] told me to because she wanted me to—my nana asked me to tell the doctor that my daddy hurt me and he really didn't. And my mama and grandpa are afraid we're going to get in trouble."

The family court judge in the *Litchfield* divorce decree ordered the parties to deny access or visitation of Pat Beal with the grandchildren until she "has completed a course of counseling which addresses the issues of coaching and interfering with the relationship of these parents and children." The order, the result of a settlement between the parties, was not appealed and Pat Beal's visitation rights were restored after she completed the required counseling.

Appellant exemplified something of a Horatio Alger tale. She testified she had a somewhat troubled childhood and adolescence, growing up in New York with an alcoholic father. She left home, dropped out of school at the age of sixteen, and had a failed relationship with a heroin addict. She later met and married and the couple had two children, moving to Charleston after her husband joined the Air Force. Appellant's husband was killed in a car wreck when she was twenty-five years old. Appellant passed tests of General Educational Development, obtaining her "GED." She then went to college for eight years while working part-time jobs and taking care

of her children, eventually obtaining a bachelor's degree in sociology. Appellant ultimately obtained a master's degree in counseling and, finally, realizing part of her dream, became a licensed professional counselor able to work with children and families.

Appellant had planned to begin her own counseling business in Dorchester County, but Appellant and two lawyers testified her reputation and chance to start a counseling business were ruined by the defamatory newspaper article. No lawyer needing a guardian ad litem or family counselor could take a chance on hiring such a controversial person because it would simply bring too many extraneous issues and problems into a case.

Appellant testified she worked from her home as a guardian ad litem and counselor in divorce and other family-related cases, and she considered her role to be a private, confidential one involving very personal matters. She understood that legislators, family court officials, and others at the time were publicly debating potential changes in the guardian system, but she did not speak out publicly on the topic.

■ Newspaper defended the case primarily on the grounds the information in the article was true and accurate, *i.e.*, Appellant had not properly investigated the case, had reached erroneous conclusions and recommendations too summarily, and had manipulated the family court. The author of the article, Bill Davis, testified he and Newspaper handled the story carefully and appropriately. Davis testified he tried to contact Appellant before publishing it even though none of his notes contained her telephone number. He did not try to contact attorneys involved in the Beal case. Davis conceded his only source for the "Whom to Believe" subsection was a fifteen-to thirty-minute telephone conversation with Pat Beal. Davis admitted he could have obtained the Litchfields' publicly recorded divorce decree, which refuted or at least called some of Pat Beal's claims into question.[2] In addition, Newspaper

---

2. Davis repeatedly stated the article accurately and truthfully reported Pat Beal's comments and opinions on the guardian ad litem system and her daughter's custody battle. Newspaper repeats this same comment in its brief, stating it planned at trial to "demonstrate conclusively that there were four statements and the [Newspaper's] source honestly

contended Appellant was a public figure or public official required to prove constitutional actual malice, which she was unable to do, in order to prevail in the lawsuit.

The trial initially progressed in the usual manner. It appears that, by the third day, Wednesday, the trial judge expressed concern about the potential length of the trial.[3] Newspaper suggested the evidence initially should be limited to issues of Appellant's status and whether she had presented sufficient evidence of actual malice to submit the case to the jury. The judge, in turn, suggested the parties agree to bifurcate the case between liability and damages, an idea Appellant initially resisted. By Friday morning, the decision to bifurcate the case apparently had been agreed upon and was understood by the parties, as the judge directed Appellant, "I don't want you to put on any damage witnesses right now. We're only talking about liability."[4]

On Friday afternoon, the trial judge explained to the parties he would instruct the jury after Appellant rested her case on liability and the parties presented closing arguments. He would then hear arguments and rule on Newspaper's directed verdict motion on whether Appellant was a private figure, public figure, or public official while the jury deliberated. The judge subsequently explained to the jury that he had "limited the amount of testimony that you have heard to only questions that involve the issue of liability." The jury would be given a

---

thought them to be true." This position distorts the concept that truth is a defense to defamation when, as occurred in this case, it is undisputed that certain statements were uttered and later published accurately in written form. A defendant or publisher asserting truth as a defense must prove that the statement or purported fact is true, not that the person quoted actually made the statement. *E.g. Curtis Pub. Co. v. Butts*, 388 U.S. 130, 151, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (truth is an absolute defense in almost all libel and slander cases); *Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 580, 556 S.E.2d 732, 737 (Ct.App.2001) (publisher may avoid liability in any type of defamation case by proving the statement is true).

3. The trial lasted eight days, from March 22–30, 2004. Appellant was on the witness stand from Monday, March 22, through Thursday morning, March 25.

4. Newspaper states that the trial judge communicated his decision regarding bifurcation of the trial in off-the-record discussions on Wednesday evening and Thursday morning.

special verdict form after hearing closing arguments and instructions on the law. Neither party objected to the procedure. Newspaper did not attempt to offer any witnesses or evidence during the liability phase of the trial.

The parties and judge discussed the jury charges and special verdict form at length. Both parties made closing arguments to the jury, focusing only on whether the article was false and defamatory, and whether Appellant had shown Newspaper acted negligently or with actual malice.

The judge instructed the jury it was only to determine the issue of liability, not damages, and charged the jury on the elements of a defamation action. The judge told the jury not to consider the statement regarding a guardian who had a sexual relationship with the father of a child she represented. The judge earlier had ruled that statement did not have a defamatory meaning with regard to Appellant because the article clearly identified another guardian accused of that act. Because he had not yet ruled on the issue of Appellant's status, the judge charged the jury on both private figure and negligence law, and the concepts of public figure, public official, and constitutional actual malice. The judge explained the special verdict form in detail to the jury.

While the jury was out, the judge heard arguments on Newspaper's directed verdict motion that Appellant was a public figure or public official who must prove Newspaper acted with actual malice, a burden she had failed to meet. The judge did not rule on the motion before the jury returned with its verdict.

The special verdict form approved by both parties posed four yes/no questions: (1) whether Appellant had proven by a preponderance of the evidence that Newspaper published a statement about Appellant that was false; (2) whether Appellant had proven by a preponderance that the false statement about Appellant was defamatory; (3) whether Appellant had proven by a preponderance that Newspaper's publication of a false and defamatory statement about Appellant was negligent; and (4) whether Appellant had proven by clear and convincing evidence that Newspaper acted with actual malice

in publishing a false and defamatory statement about Appellant.[5] The jury answered "yes" to all four questions.

The trial judge told jurors they would have to return the following week to consider evidence of Appellant's damages, and sent them out to discuss when they would prefer to return. The judge then denied Newspaper's directed verdict motion, ruling Appellant was a private figure required to prove negligence to recover damages in her defamation action.

At this point the case took an unusual procedural turn. Newspaper moved for a mistrial because the judge had told jurors they would return only to determine damages, but Newspaper had not yet presented a defense. The judge agreed to correct his "misstatement." He called the jurors back in and told them that they would return to hear evidence of Appellant's damages and Newspaper's defense. The questions the jury answered in the special verdict form were only "advisory interrogatories."

On Monday morning, Newspaper restated its objection to the process followed. Counsel stated it had "never crossed my mind, of course, that you would let the case go out to the jury if there was any—if you had anything going on in your mind that I was going to put up a defense. . . . I thought you were sending a clear signal to me that I wasn't putting up a defense in this case. What else could it be to send the jury out before I put up a defense?" Newspaper believed the judge planned to dismiss the case on its directed verdict motion even if the jury returned with all "yes" answers. The jury was tainted in Appellant's favor by already discussing the merits of the case and ruling on "advisory interrogatories."

After much discussion, the judge instructed the jury the "special interrogatories" it had answered "are not binding upon you during the remainder of the trial." Appellant would present evidence of damages and Newspaper would present its defense. The case would be submitted anew to the jury,

---

5. The form instructed the jury to answer Question 2 only if the answer to Question 1 was "yes," and to answer Questions 3 and 4 only if it answered "yes" to the first two questions. The form further instructed the jury that Question 3 applied only if the Court found Appellant was a private figure, and Question 4 applied only if the Court found Appellant was a public figure or public official.

which would not be bound by its earlier answers in the special verdict form.

Accordingly, Appellant presented evidence of damages to her reputation, emotional distress and accompanying physical problems, and loss of the opportunity to start her own counseling business, then rested her case. Newspaper renewed its directed verdict motion on Appellant's status, which was denied.

Newspaper presented its defense, recalling the reporter (who already had testified in Appellant's case), Appellant, and the psychologist mentioned by Pat Beal in the article. Newspaper questioned Appellant about Karen Winner, the author of the "Winner report" which discussed the actions of private guardians in several family court cases. Appellant testified she had separately sued Winner and several other persons for defamation. Appellant testified she asked another guardian ad litem (Marilyn Lassiter, who was named and accused of wrongdoing in the same article) to attend a publicly advertised meeting and secretly tape-record it because she had been told "that a group had been formed to ruin me [and] to try to put me in jail." Appellant also had listened to audiotapes secretly made by two other friends who had attended the group's meetings. Newspaper questioned Appellant about three private letters she wrote in 1999 regarding the guardian reform controversy and questions about her education and training to two Governor's Office officials.

Newspaper renewed its directed verdict motion on Appellant's status and the judge heard additional arguments. Reversing his earlier decision, the judge ruled Appellant was a limited public figure who had not presented clear and convincing evidence to prove Newspaper acted with actual malice. Therefore, the judge granted Newspaper's directed verdict motion. The case was not resubmitted to the jury.

Newspaper's motions to dismiss Appellant's claims for negligence and invasion of privacy had been previously granted pursuant to Rule 12(b)(6), SCRCP, after a pretrial hearing by another circuit judge. Appellant appealed the rulings of both judges. This appeal was certified to the Court on motion of the Court of Appeals pursuant to Rule 204(b), SCACR.

Appellant raises numerous issues. We find it necessary to discuss only three issues and we affirm the remaining issues pursuant to Rule 220(c), SCACR.

## ISSUES

I. Did the trial judge err in ruling that Appellant, a private guardian ad litem appointed to represent the children's interests in a divorce and child custody dispute, was a limited public figure who must prove constitutional actual malice in order to recover damages in a defamation action?

II. Does sufficient evidence support the jury's finding of constitutional actual malice such that Appellant, if she is determined to be a private figure, is entitled to recover punitive damages from Newspaper?

III. Did Newspaper agree to bifurcation of the trial on liability and damages, consequently waiving the right to object to bifurcation or its decision not to present evidence during the liability phase of the trial?

## STANDARD OF REVIEW

In ruling on a motion for directed verdict, the trial court must view the evidence and the inferences which reasonably can be drawn therefrom in the light most favorable to the party opposing the motion. The trial court must deny the motion when either the evidence yields more than one inference or its inference is in doubt. *Strange v. S.C. Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 429–30, 445 S.E.2d 439, 440 (1994). When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence. *Creech v. S.C. Wildlife and Marine Resources Dep't*, 328 S.C. 24, 491 S.E.2d 571 (1997). The appellate court must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his favor. *Bultman v. Barber*, 277 S.C. 5, 7, 281 S.E.2d 791, 792 (1981). If the evidence is susceptible to more than one reasonable inference, the case should be submitted to the jury. *Quesinberry v. Rouppasong*, 331 S.C. 589, 594, 503 S.E.2d 717, 720 (1998).

■ When ruling on a motion for summary judgment or directed verdict in a defamation action, the court must review the evidence using the same substantive evidentiary standard of proof the jury is required to use in a particular case. *George v. Fabri,* 345 S.C. 440, 451–54, 548 S.E.2d 868, 874–75 (2001). An appellate court reviews the granting of such a motion using the same standard. *Id.*

■ In an action at law, on appeal of a case tried by a jury, the jurisdiction of the appellate court extends merely to the correction of errors of law, and a factual finding by the jury will not be disturbed unless a review of the record discloses that there is no evidence which reasonably supports the jury's findings. *Townes Assoc., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976).

## LAW AND ANALYSIS

### I. APPELLANT'S STATUS AS A PUBLIC OFFICIAL, PUBLIC FIGURE, OR PRIVATE FIGURE

Appellant argues the trial judge erred in granting Newspaper's directed verdict motion that Appellant, a private guardian ad litem appointed to represent the children's interests in a divorce and child custody dispute, was a limited public figure who must prove constitutional actual malice in order to recover damages. Prior to publication of the article, Appellant was not famous, had no special access to the media, never sought the public's attention, did not thrust herself voluntarily into a public controversy, and did not assume any special prominence in the resolution of an issue of public concern. While the debate about potential reform of the guardian system was a public controversy, Appellant contends she was a private figure who must prove by a preponderance of the evidence that Newspaper; acted negligently in publishing false and defamatory statements about her in order to recover damages. We agree in part.

■■ The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. *Holtzscheiter v. Thomson Newspapers, Inc.,* 332 S.C. 502, 508, 506 S.E.2d 497, 501 (1998) (*Holtzscheiter II* ).

Defamatory communications take two forms: libel and slander. Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct. *Id.*

In order to prove defamation, the plaintiff must show (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Fleming v. Rose,* 350 S.C. 488, 494, 567 S.E.2d 857, 860 (2002); *Holtzscheiter II,* 332 S.C. at 506, 506 S.E.2d at 518 (Toal, J., concurring).

A defamation action is analyzed primarily under the common law in cases in which the plaintiff is a private figure. A statement is classified as defamatory *per se* when the meaning or message is obvious on its face. A statement is classified as defamatory *per quod* when the defamatory meaning is not clear unless the hearer knows facts or circumstances not contained in the statement itself, and the plaintiff must introduce extrinsic facts to prove the defamatory meaning. *Holtzscheiter II,* 332 S.C. at 508–09, 506 S.E.2d at 501. In addition to those classifications, a statement may be actionable *per se,* in which case the defendant is presumed to have acted with common law malice and the plaintiff is presumed to have suffered general damages. Or a statement may be not actionable *per se,* in which case nothing is presumed and the plaintiff must plead and prove both common law malice and special damages. The determination of whether or not a statement is actionable *per se* is a matter of law for the court to resolve. *Id.* at 509–10, 506 S.E.2d at 501–02.[6]

Under the common law, "[l]ibel is actionable *per se* if it involves written or printed words which tend to degrade a person, that is, to reduce his character or reputation in the estimation of his friends or acquaintances, or the public, or to

---

6. General damages include injury to reputation, mental suffering, hurt feelings, emotional distress, and similar types of injuries which are not capable of definite money valuation. Special damages are tangible losses or injuries to the plaintiff's property, business, occupation, or profession in which it is possible to identify a specific amount of money as damages. *Holtzscheiter II,* 332 S.C. at 510 n. 4, 506 S.E.2d at 502 n. 4.

disgrace him, or to render him odious, contemptible, or ridiculous." *Holtzscheiter II*, 332 S.C. at 510–11, 506 S.E.2d at 502. Essentially, all libel is actionable *per se*, while only certain categories of slander are actionable *per se*.[7] *Id.* Common law malice means the defendant acted with ill will toward the plaintiff, or acted recklessly or wantonly, *i.e.*, with conscious indifference of the plaintiff's rights. *Padgett v. Sun News*, 278 S.C. 26, 32, 292 S.E.2d 30, 34 (1982).

 There are three important caveats with regard to private-figure plaintiffs, resulting from the need to balance First Amendment rights with the right of individuals to be compensated for damage caused by defamatory statements. First, in a case involving an issue of public controversy or concern where the libelous statement is published by a media defendant, the common law presumptions the defendant acted with common law malice and the plaintiff suffered general damages do not apply. Instead, the private-figure plaintiff must plead and prove common law malice and show "actual injury" in the form of general or special damages. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346–50, 94 S.Ct. 2997, 3010–12, 41 L.Ed.2d 789, 809–11 (1974); *Holtzscheiter II*, 332 S.C. at 512, 506 S.E.2d at 503 (plurality opinion); *Holtzscheiter II*, 332 S.C. at 519–20, 506 S.E.2d at 506–07 (Toal, J., concurring). Second, in a case involving an issue of public controversy or concern where the libelous statement is published by a media defendant, the common law presumption that the libelous statement is false is not applied. Instead, the private-figure plaintiff must prove the statement is false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775–79, 106 S.Ct. 1558, 1563–65, 89 L.Ed.2d 783, 791–94 (1986); *Holtzscheiter II*, 332 S.C. at 512, 506 S.E.2d at 503; *Parker v. Evening Post Pub. Co.*, 317 S.C. 236, 243, 452 S.E.2d 640, 644 (Ct.App.1994). Third, in order to recover punitive damages from a media defendant, a private-figure plaintiff must prove by clear and convincing evidence that the defendant acted with constitu-

---

7. Under the common law, slander is actionable *per se* only when it charges the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession. *Holtzscheiter II*, 332 S.C. at 511 n. 5, 506 S.E.2d at 502 n. 5.

tional actual malice, *i.e.,* the defendant published the statement with knowledge it was false or with reckless disregard of whether it was false or not. *Gertz,* 418 U.S. at 346–50, 94 S.Ct. at 3010–12, 41 L.Ed.2d at 809–11; *Holtzscheiter II,* 332 S.C. at 512, 506 S.E.2d at 503.

Concepts of common law defamation have been significantly modified since the 1960s by the First Amendment jurisprudence of the United States Supreme Court. *See Holtzscheiter II* 332 S.C. 502, 506 S.E.2d 497 (plurality and concurring opinions discussing impact of First Amendment-based principles). "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. Since *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), federal and state courts have "sought to define the accommodation required to assure the vigorous debate on public issues that the First Amendment was designed to protect while at the same time affording protection to the reputations of individuals." *Hutchinson v. Proxmire,* 443 U.S. 111, 133–34, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411, 430 (1979).

"[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in uninhibited, robust, and wide-open debate on public issues." *Gertz,* 418 U.S. at 340, 94 S.Ct. at 3007, 41 L.Ed.2d at 805. Errors, however, are inevitable. "[P]unishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship." *Id.*

Consequently, to prove fault in a defamation action, a plaintiff who is a public official or public figure must prove by clear and convincing evidence that the defendant acted with actual malice in publishing a false and defamatory statement about the plaintiff. *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706; *Time, Inc. v. Firestone,* 424 U.S. 448, 453–55, 96 S.Ct. 958, 964–66, 47 L.Ed.2d 154, 162–63 (1976); *Curtis v. Butts,* 388 U.S. 130, 162–65, 87 S.Ct. 1975, 1995–96, 18 L.Ed.2d 1094, 1115–17

(1967) (Warren, Ch. J., concurring); *Fleming v. Rose*, 350 S.C. 488, 494–95, 567 S.E.2d 857, 860–61 (2002); *George v. Fabri*, 345 S.C. 440, 451, 548 S.E.2d 868, 874 (2001); *Holtzscheiter II*, 332 S.C. at 521–23, 506 S.E.2d at 507–08 (Toal, J., concurring). Actual malice exists when a statement is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706. "Actual malice under the *New York Times* standard should not be confused with the concept of [common law] malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447, 468 (1991).

 Thus, an important initial step in analyzing any defamation case is determining whether a particular plaintiff is a public official, public figure, or private figure.[8] This determination is a matter of law which must be decided by the court, on a case by case basis after a careful examination of the facts and circumstances, before the jury is charged on the law or asked to resolve a case. This ruling is needed in order for the court to determine whether to instruct the jury on law applicable to private-figure or public-figure and public-official plaintiffs.[9] *See Rosenblatt v. Baer*, 383 U.S. 75, 87, 86 S.Ct. 669, 677, 15 L.Ed.2d 597, 606 (1966) (trial judge generally has duty of in first instance to determine whether allegedly libeled

---

8. The United States Supreme Court has explained that deciding whether a particular topic is a matter of public controversy or concern, while important in the analysis of a defamation action, is of lesser import than determining a plaintiff's status. "Whatever their general validity, use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area. It was our recognition and rejection of this weakness in the *Rosenbloom* test which led us in *Gertz* to eschew a subject-matter test for one focusing upon the character of the defamation plaintiff." *Time*, 424 U.S. at 454–56, 96 S.Ct. at 965–66, 47 L.Ed.2d at 164 (citing *Rosenbloom v. Metromedia*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)).

9. The ruling could be made before trial pursuant to a pretrial motion when facts pertaining to a plaintiff's status are either stipulated or sufficiently known, or made during trial after pertinent facts are sufficiently established. An earlier ruling may better focus the attention of the court and parties on pertinent issues and evidence.

party is a public official); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551 (4th Cir.1994) (question of whether defamation plaintiff is a limited-purpose public figure is an issue of law for the court); *Mead Corp. v. Hicks*, 448 So.2d 308, 310 (Ala.1983) (stating same principle); Tracey A. Bateman, *Who is "Public Figure" for Purposes of Defamation Action*, 19 A.L.R.5th 1, 57 (1994) (stating same principle); *cf. Sanders v. Prince*, 304 S.C. 236, 403 S.E.2d 640 (1991) (directing trial judge to charge only constitutional actual malice principles in retrial of case involving public official, and forbidding charge on inapplicable principles of common law malice).

## A. PUBLIC OFFICIAL

 Neither the Supreme Court nor this Court has provided a precise or all-encompassing definition of "public official," although it is clear the category does not include all public employees. *See Hutchinson,* 443 U.S. at 119 n. 8, 99 S.Ct. at 2680 n. 8, 61 L.Ed.2d at 421 n. 8. In general, a public official is a person who, among the hierarchy of government employees, has or appears to the public to have "substantial responsibility for or control over the conduct of governmental affairs." *Holtzscheiter II,* 332 S.C. at 520 n. 4, 506 S.E.2d at 507 n. 4 (Toal, J., concurring) (quoting *Rosenblatt,* 383 U.S. at 85, 86 S.Ct. at 676, 15 L.Ed.2d at 605). "In considering the question of whether one is a public official, the employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* (quoting *Rosenblatt* ) (internal quotes omitted). "The status of a public official may be deemed sufficient to warrant application of the *New York Times* privilege, not because of the government employee's place on the totem pole, but because of the public interest in a government employee's activity in a particular context." *McClain v. Arnold,* 275 S.C. 282, 284, 270 S.E.2d 124, 125 (1980) (holding that police officer wrongly identified in lawsuit as officer who falsely arrested plaintiff while working as agent of grocery store was a public official required to prove newspaper acted with actual malice); *see also Miller v. City of West Columbia,* 322 S.C. 224, 471 S.E.2d 683 (1996) (treating assistant police chief as public official for purposes of defamation action); *Goodwin v. Kenne-*

*dy*, 347 S.C. 30, 43–45, 552 S.E.2d 319, 326–27 (Ct.App.2001) (concluding assistant school principal was not public official under circumstances of case).

The parties have not cited, nor have we found, any authority directly addressing whether a private guardian ad litem in a family court case is a public official. Newspaper relies on *Press, Inc. v. Verran*, 569 S.W.2d 435 (Tenn.1978), *Villarreal v. Harte–Hanks Commun., Inc.*, 787 S.W.2d 131 (Tex.App. 1990), and *Kahn v. Bower*, 232 Cal.App.3d 1599, 284 Cal.Rptr. 244 (1991). Those cases are distinguishable from the case *sub judice*. The plaintiffs in those cases were found to be public officials because they were employees of state social service agencies who had the authority to investigate allegations of child abuse, decide which version of events to believe, and take actions such as removing a child from a home. In contrast, Appellant is a guardian who investigates a case on behalf of the family court and makes recommendations when asked, but has no unilateral authority to resolve care or custody issues. *See Patel v. Patel*, 347 S.C. 281, 287, 555 S.E.2d 386, 389 (2001) ("GAL functions as a representative of the court, appointed to assist the court in making its determination of custody by advocating for the best interest of the children and providing the court with an objective view"; Court set forth base-line standards on duties and responsibilities of a GAL); *Fleming v. Asbill*, 326 S.C. 49, 53, 483 S.E.2d 751, 753–54 (1997) (private guardian ad litem is not an agent or employee of the State, but functions as a representative of the court to assist the court in properly protecting the interests of an incompetent person; guardian does not create or resolve legal relationships between the court and third parties); S.C.Code Ann. §§ 20–7–1545 to –1557 (Supp.2005) (South Carolina Private Guardian Ad Litem Reform Act, enacted in 2002 and establishing duties and responsibilities of guardian).

Newspaper further urges us to find Appellant is a public official because a private guardian ad litem generally enjoys immunity from lawsuits. *See Fleming*, 326 S.C. at 54–58, 483 S.E.2d at 754–56 (private persons appointed as guardians ad litem in private custody proceedings are afforded absolute quasi-judicial immunity for acts performed within scope of their appointment). Newspaper argues that a private guardian should be deemed a public official because, given that a

person affected by the guardian's allegedly offensive or wrongful statements or actions likely is prohibited from suing the guardian, then the wronged person is left without a remedy. He will not only be unable to sue but also forced to stand silent, prevented from criticizing or opposing the guardian for fear of prompting a defamation suit brought by a guardian who enjoys the less rigorous standard of proof afforded private-figure plaintiffs.

▪ Immunity to suit is an appropriate factor to consider in analyzing whether a particular individual is a public official for purposes of a defamation action, and immunity may lend support to reaching such a conclusion in an appropriate case. However, no one factor is dispositive in the analysis and Newspaper's argument is not persuasive in the present case. It is not necessary to take the unwarranted step of designating a private guardian ad litem as a public official to enable litigants or persons who believe they have been wronged sufficient latitude to criticize or oppose the guardian's statements or conclusions. The law of defamation does not prevent a person from expressing and publishing truthful or non-defamatory statements—including pointed criticisms—of a guardian's actions in a particular case, regardless of whether the guardian is designated a public official, public figure, or private figure. Furthermore, as we explained in *Fleming,* other safeguards exist to control a wayward guardian. Such safeguards include the fact a guardian is not immune from suit for actions beyond the scope of her duty; the fact an opponent may cross-examine the guardian and supporting witnesses at a deposition and at trial, as well as present his own evidence in opposition; and the review and oversight powers which both trial and appellate courts wield over a guardian. *Fleming,* 326 S.C. at 56–57, 483 S.E.2d at 755–56.

Accordingly, we conclude Appellant, a private guardian ad litem who represented children in a divorce and child custody dispute, is not a public official. Appellant is not a government employee, much less an official who has or would appear to the public to have substantial responsibility for or control over the conduct of government affairs. The position of a private guardian ad litem is not one which invites public scrutiny and discussion of the person holding it, entirely apart from the

scrutiny and discussion occasioned by the particular charges in controversy.

### B. PUBLIC FIGURE

 The United States Supreme Court generally has defined a public figure as follows: "For the most part those who attain this status [of public figure] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808 (an attorney was not a public figure even though he voluntarily exposed himself in a case certain to receive extensive media exposure); *Time,* 424 U.S. 448, 452–55, 96 S.Ct. at 964–66, 47 L.Ed.2d at 161–63 (*New York Times* actual malice standard did not apply to wife of wealthy industrialist allegedly defamed by media defendant in high-profile divorce case because she was not a public figure); *George v. Fabri,* 345 S.C. 440, 548 S.E.2d 868 (2001) (plaintiff candidate's engineering firm was a limited public figure under *Gertz* test in defamation action arising from statements made during political campaign); *Holtzscheiter II,* 332 S.C. at 523 n. 8, 506 S.E.2d at 508 n. 8 (1998) (Toal, J., concurring and discussing *Gertz* )

 A limited public figure, the type more commonly found, is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. In determining whether a claimant is a private or public figure, the court must focus on the "nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812; *Wolston v. Reader's Digest Assn., Inc.,* 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450, 460 (1979); *Parker v. Evening Post Pub. Co.,* 317 S.C. 236, 243 n. 3, 452 S.E.2d 640, 644 n. 3 (Ct.App.1994).

(automobile dealer invited public's attention through extensive media advertising and, as to statements regarding his dealership, was a public figure).

The United States Supreme Court identified a third category of involuntary public figures who become public figures through no purposeful action of their own. However, "the instances of truly involuntary public figures must be exceedingly rare." *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.

All three types of public figures, just as public officials, must meet the *New York Times* standard of actual malice in order to recover damages for defamation. Public figures and public officials are entitled to less protection from defamation than private figures because they enjoy greater media access and are less vulnerable to injury from defamatory statements due to their ability to publicly rebut such statements. Furthermore, both public figures and public officials are less deserving of protection because they have voluntarily exposed themselves to the increased risk of defamation. *Foretich,* 37 F.3d at 1552 (discussing *Gertz* ).

The court must focus on facts and circumstances relating to the claimant's status at the time the issue of public concern or controversy arose. "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707, 61 L.Ed.2d at 460. "[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson,* 443 U.S. at 134–135, 99 S.Ct. at 2687–88, 61 L.Ed.2d at 430–32 (focusing on whether plaintiff research professor was a public figure prior to controversy engendered by senator's awarding of "Golden Fleece" to claimant's research project). A defendant may not transform a private figure into a limited public figure by dragging an unwilling participant into the spotlight of a public controversy through the defendant's own words or actions. *Wolston,* 443 U.S. at 166, 99 S.Ct. at 2706–07, 61 L.Ed.2d at 459–60, 443 U.S. 157, 167 (claimant, by refusing to comply with grand jury subpoena in espionage case, did not voluntarily thrust himself into the public controversy; "It would be more

accurate to say that petitioner was dragged unwillingly into the controversy."). These principles do not, of course, mean a private figure may never become a limited public figure; such a transformation may occur by virtue of a private figure's own actions or words during the course of a public controversy.

Appellant does not fall into the first category of public figure. Appellant did not occupy a position of such persuasive power and influence that she is a public figure for all purposes. It is equally obvious that hers is not one of the exceedingly rare cases in which Appellant somehow became an involuntary public figure through no purposeful action of her own.

We agree with the analysis set forth by the Fourth Circuit in *Foretich*, 37 F.3d 1541, to determine whether Appellant is a limited public figure which, as we previously noted, is a matter of law for the court to decide before submitting a case to a jury. In order for the court to properly hold that a plaintiff is a public figure for the limited purpose of comment on a particular public controversy, the defendant must show: (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation. *Foretich*, 37 F.3d at 1553.

In the present case, Appellant had no more access to channels of effective communication, such as the media, than any ordinary, private person. Appellant did not voluntarily assume a role of special prominence in the controversy over reforming the guardian system, and she did not seek to influence the outcome of that controversy. In fact, the record shows Appellant tried to avoid the spotlight and the controversy. The private letters Appellant wrote to the Governor's Office were intended to correct misinformation about her alleged lack of education and training, and to express concern over false accusations made by people upset about particular family court cases. The public meetings which Appellant's friends secretly tape-recorded for her do not constitute at-

tempts to thrust herself into the controversy. Appellant simply was trying to learn what admittedly angry participants in a divorce and custody dispute were saying about her. The public controversy regarding the guardian system existed before Newspaper published the article. But neither the person who made the statements (Pat Beal) nor the publisher (Newspaper) may, by their own words and actions, transform Appellant into a limited public figure by dragging her unwillingly into the controversy over reform of the guardian system.

The trial judge erred in ruling Appellant is a limited public figure. Appellant, under the facts and circumstances of this case, is a private-figure plaintiff as a matter of law. As such, she is entitled to recover under the common law defamation principles set forth above.

Statements regarding Appellant's lack of investigation and manipulation of a judge were in the form of libel *per se* and were actionable *per se;* the statements regarding Appellant's attempts to prevent the mother from getting full custody and blocking the grandmother's visitation rights constituted libel *per quod* and also were actionable *per se.* The statements were published by a media defendant on an issue of public controversy or concern, *i.e.,* reforms purportedly needed in the private guardian ad litem system. Consequently, even though she is a private figure, Appellant may not benefit from any of the common law presumptions. Appellant is required to plead and prove common law malice, demonstrate the falsity of the statements, and show actual injury in the form of general or special damages. Appellant bears the burden of proving her case by a preponderance of the evidence.

In this case, the judge charged the jury that a private-figure plaintiff must prove by a preponderance of the evidence that Newspaper acted *negligently* in publishing a false and defamatory statement. No party objected to this charge and it was, in fact, the charge the parties requested and desired. Chief Justice Toal in *Holtzscheiter II* suggested we join the majority of jurisdictions which have adopted a negligence standard for private-figure plaintiffs. *Holtzscheiter II,* 332 S.C. at 523, 506 S.E.2d at 508–9.[10] However, the

---

10. This Court upheld a jury verdict in favor of a private-figure plaintiff against a media defendant that apparently was grounded in negligence,

plurality of the Court in *Holtzscheiter II* chose to retain common law malice and accompanying presumptions in private-figure actions. We do not revisit the issue in this case because no party objected to use of the negligence standard; therefore, it is the law of the case. *See Charleston Lumber Co. v. Miller Housing Corp.*, 338 S.C. 171, 175, 525 S.E.2d 869, 871 (2000) (unappealed ruling, right or wrong, is the law of the case and requires affirmance); *Buckner v. Preferred Mut. Ins. Co.*, 255 S.C. 159, 177 S.E.2d 544 (1970) (same). Moreover, a party may not complain on appeal of error or object to a trial procedure which his own conduct has induced. *E.g. Shearer v. DeShon*, 240 S.C. 472, 484, 126 S.E.2d 514, 520 (1962); *Floyd v. Thornton*, 220 S.C. 414, 425–26, 68 S.E.2d 334, 339 (1951).

Accordingly, we reverse the trial judge's grant of a directed verdict to Newspaper on the issues of Appellant's status and liability for defamation. We conclude as a matter of law Appellant, under the facts and circumstances of this case, is a private-figure plaintiff. Appellant, as shown by the special verdict form, proved by a preponderance of the evidence that the statements were false and defamatory. The jury found Newspaper liable for defamation pursuant to instructions which were grounded in negligence and which were agreed upon by the parties. Therefore, Appellant is entitled upon remand to seek actual damages, *i.e.*, general and special damages.

## II. CONSTITUTIONAL ACTUAL MALICE

The jury in its special verdict form determined Appellant had proven by clear and convincing evidence Newspaper acted with constitutional actual malice, *i.e.*, Newspaper published the statement with knowledge it was false or with reckless disregard of whether it was false or not. This finding is relevant in Appellant's case because, as a private figure, she is entitled to recover punitive damages from a media defendant only if she proves actual malice. *See Gertz*, 418 U.S. at 346–50, 94 S.Ct. at 3010–12, 41 L.Ed.2d at 809–11; *Holtzscheiter II*, 332 S.C. at 512, 506 S.E.2d at 503. Newspaper

although the issue was not addressed. *Jones v. Sun Publishing Co.*, 278 S.C. 12, 292 S.E.2d 23 (1982). We have found no other South Carolina authority addressing the issue of using a negligence standard in private-figure defamation cases.

argues the record does not support a finding of actual malice. We disagree.

 Whether evidence is sufficient to support a jury's finding of constitutional actual malice in a defamation action is a question of law. The trial court must make such a determination before submitting the issue to a jury. When the jury makes such a finding, the appellate court must independently examine the record to determine whether the evidence sufficiently supports a finding of actual malice. *Elder v. Gaffney Ledger*, 341 S.C. 108, 113, 533 S.E.2d 899, 901–02 (2000) (citing *Harte–Hanks Commun., Inc. v. Connaughton*, 491 U.S. 657, 685–86, 109 S.Ct. 2678, 2694–95, 105 L.Ed.2d 562, 587 (1989)). This review is necessary due to the "unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte–Hanks Commun.*, 491 U.S. at 686, 109 S.Ct. at 2695, 105 L.Ed.2d at 587; *accord George v. Fabri*, 345 S.C. 440, 456–57, 548 S.E.2d 868, 876 (2001).

 As we explained in *Elder*,

Actual malice is a subjective standard testing the publisher's good faith belief in the truth of his or her statements. The constitutional actual malice standard requires a public official to prove by clear and convincing evidence that the defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for its truth. A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. There must be evidence the defendant had a high degree of awareness of ... probable falsity.

Failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. Actual malice may be present, however, where one fails to investigate and there are obvious reasons to doubt the veracity of the informant.

*Elder*, 341 S.C. at 114, 533 S.E.2d at 902 (citations, quotes, and emphasis omitted). "A subjective awareness of probable falsi-

ty can be shown if there are obvious reasons to doubt the veracity of the informant or accuracy of his report." *Anderson v. Augusta Chronicle,* 365 S.C. 589, 596, 619 S.E.2d 428, 432 (2005) (citing *Harte–Hanks Commun.,* 491 U.S. at 688, 109 S.Ct. at 2696, 105 L.Ed.2d at 589). "The right of a free press is not absolute in a society that demands social responsibility and personal integrity.... In the interests of justice, we will not allow a publication to go so unchecked as to promote the tyrannical imposition of false and misleading information—the very concern our forefathers sought to eliminate in demanding the press be free." *Anderson,* 365 S.C. at 599–600, 619 S.E.2d at 433 (Burnett, J., concurring).

In the present case, Newspaper published allegations in a front-page story about a private figure which, on their face, appear potentially devastating to the reputation of a private guardian ad litem. Evidence supporting the jury's finding of actual malice includes (1) the fact that the portion of the article pertaining to Appellant was based solely on a fifteen-to thirty-minute telephone conversation with Pat Beal, an admittedly "incensed" person; (2) the fact Newspaper purportedly failed to even try to contact Appellant to discuss the matter with her; (3) the fact Newspaper failed to contact attorneys or others involved in the *Litchfield* case; and (4) the fact Newspaper failed to even try to obtain the publicly recorded divorce decree in the *Litchfield* case, a reading of which would have called into question or refuted Pat Beal's allegations. This evidence does not indicate merely a failure to investigate which, standing alone, would be insufficient to uphold a finding of actual malice. This evidence constitutes a failure to investigate before publishing an article when there were obvious reasons to doubt the veracity of Pat Beal or the accuracy of her report. Thus, the evidence indicates Newspaper's subjective awareness of probable falsity of the report and is sufficient to support the jury's finding of actual malice. Accordingly, we affirm the jury's finding of actual malice and remand this case for a jury to consider the issue of punitive damages.

## III. NEWSPAPER'S WAIVER OF OBJECTION TO BIFURCATION

A jury has not yet determined whether Appellant is owed any money damages in this matter. In reversing the trial

judge's grant of a directed verdict to Newspaper on the issues of Appellant's status and liability, and remanding for a jury to determine whether to award damages, we must necessarily address whether the jury's verdict on liability must stand or whether this case should be remanded for a new trial absolute.

Appellant asserts the trial judge plainly bifurcated the case on liability and damages. After doing so, the judge was without authority to subsequently reopen the liability issue or disturb the jury's verdict on liability by treating it as a response to "advisory interrogatories" which could be ignored in reaching a new verdict addressing both liability and damages. Newspaper made a "calculated tactical decision" in declining to present a defense during the liability phase. Appellant argues Newspaper acquiesced to the procedure followed because Newspaper anticipated tired jurors would quickly return a defense verdict.[11]

Newspaper, at trial, in its brief, and at oral argument before us freely admitted it fully expected the judge to rule in Newspaper's favor on the directed verdict motion regardless of any verdict returned by the jury. In its brief, Newspaper states it "consented to the procedure advocated by the trial judge because there was more than enough evidence in the record at the time to ensure a directed verdict. By sending the jury out to deliberate, counsel assumed, *incorrectly*, that the trial judge did not want [jurors] to spend a week of their lives in the jury box for nothing. The belief that the trial judge would not send a jury out to deliberate before hearing all the evidence led the [Newspaper's] attorney to assume he would not be offering a defense to a deliberating jury. A granting of [Newspaper's] motion for directed verdict was thus perfunctory." (Emphasis in original.) Newspaper asserts the procedure followed, while unusual, was acceptable and "[t]here was no harm suffered by Appellant due to the procedure."

---

11. Appellant needlessly muddles this issue by stating the jury was "discharged," which caused the circuit court to lose subject matter jurisdiction. The jury was not discharged Friday evening. It was sent home for the weekend and told to return Monday. There is no issue of subject matter jurisdiction.

■ The resolution of factual issues may be submitted to an advisory jury in a case arising in equity. *See Momeier v. McAlister, Inc.,* 190 S.C. 529, 538–39, 3 S.E.2d 606, 610 (1939) (judge in equity case has the right and power to refer issues to a jury for the enlightenment of his conscience and is not bound to accept jury's findings or verdict); *First State Sav. and Loan Assn. v. Nodine,* 291 S.C. 445, 448, 354 S.E.2d 51, 52–53 (Ct.App.1987) (same); *Neal v. Darby,* 282 S.C. 277, 283, 318 S.E.2d 18, 22 (Ct.App.1984) (same); Rule 39(c), SCRCP (providing for advisory jury in all actions not triable of right by a jury); Rule 52(a), SCRCP (requiring court to state findings of fact and conclusions of law in case tried with advisory jury).

■ The instant case in which Appellant seeks money damages for defamation arises in law, not in equity. *See Cooper v. Poston,* 326 S.C. 46, 483 S.E.2d 750 (1997) (parties in legal action for recovery of money damages are constitutionally entitled to a jury trial). It is improper in a law case to submit factual issues to a jury in the form of non-binding "advisory interrogatories." A jury's resolution of factual issues in a law case is binding on trial and appellate courts. *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 85, 221 S.E.2d 773, 775 (1976). Moreover, it is improper in any case—arising in either law or equity—to ask jurors to resolve factual issues and then, after hearing additional evidence, reconsider the same issues and render another verdict. In this case, the deliberations and decision of the jury would have been irrevocably tainted if, after it had discussed the case and rendered a verdict in favor of Appellant on the issue of liability, it was asked to ignore the earlier verdict and reconsider the issue of liability. Therefore, the trial judge erred to the extent he attempted, at Newspaper's insistence, to transform the jury's verdict on liability into "advisory interrogatories" which could be reconsidered in a subsequent verdict addressing both liability and damages. We do not condone this unusual trial procedure.

The trial judge plainly bifurcated the case on liability and damages with the consent of both parties. That is the procedure the parties discussed and the ruling the judge made, as shown by facts discussed above. The parties participated in the preparation of a special verdict form on liability, made

closing arguments on liability, the judge instructed the jury and stated it was to consider only the liability issue and not damages, and the issues of liability were presented to the jury in the special verdict form. Contrary to Newspaper's argument, the record contains no indication the trial judge initially submitted the case to jurors simply to allow them to participate fruitlessly in the trial process because they had spent more than a week listening to testimony and evidence.

■ Further, Newspaper chose, whether for tactical or other reasons, to acquiesce to bifurcation and not present a defense during the liability phase. Newspaper waived any objection it may have to bifurcation of the case, as well as its decision not to present evidence during the liability phase. *See e.g. Charleston Lumber Co.,* 338 S.C. at 175, 525 S.E.2d at 871 (unappealed ruling, right or wrong, is the law of the case and requires affirmance). It would be patently inappropriate and unfair to Appellant, as well as a violation of well-established preservation of error principles and notions of judicial economy, to give Newspaper a second chance under these circumstances to present its evidence regarding liability to a different jury in a new trial absolute. *See e.g. I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000) (preservation of error rules "prevent[] a party from keeping an ace card up his sleeve—intentionally or by chance—in the hope that an appellate court will accept that ace card and, via a reversal, give him another opportunity to prove his case"); *Shearer,* 240 S.C. at 484, 126 S.E.2d at 520 (party may not complain on appeal of error or object to trial procedure which his own conduct has induced).

In sum, we conclude the case was bifurcated on liability and damages, and Newspaper waived any objection it may have to bifurcation and its decision not to present evidence during the liability phase. Therefore, we reinstate the jury's liability verdict and remand this case for a jury to consider the issues of actual and punitive damages.

## IV. REMAINING ISSUES

First, Appellant contends the circuit court erred in granting summary judgment to Newspaper on her cause of action for invasion of privacy pursuant to Rule 12(b)(6), SCRCP. We

affirm the dismissal of that action because we find it unnecessary to address it given our disposition of other issues raised in this appeal. *See Whiteside v. Cherokee County School Dist. No. One,* 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) (appellate court need not address remaining issues when resolution of prior issue is dispositive); Rule 220(c), SCACR (appellate court may affirm for any reason appearing in the record).

In doing so, however, we do not intend to unwittingly limit evidence Appellant may present about her damages. The types of damages awarded in defamation and invasion of privacy actions often overlap. Viewed in general terms and not necessarily in the context of this case, a person may suffer emotional distress for two simultaneous reasons—the ruining of his reputation by a libelous statement and the wrongful publicizing of a private matter. *See Snakenberg v. Hartford Cas. Ins. Co.,* 299 S.C. 164, 170–71, 383 S.E.2d 2, 5–6 (Ct.App. 1989) (identifying three causes of action which may arise under rubric of invasion of privacy: wrongful appropriation of personality, wrongful publicizing of private affairs, and wrongful intrusion into private affairs); *Brown v. Pearson,* 326 S.C. 409, 422, 483 S.E.2d 477, 484 (Ct.App.1997) (noting no South Carolina case has recognized a "false light" invasion of privacy claim). Similarly, a private figure who is defamed may feel that the veil of relative privacy most people enjoy has been shredded, wrongfully and unfairly exposing his actions, work, or life to the world. A private figure such as Appellant who proves she has been defamed is not barred from asserting damages rooted in the loss of her privacy simply because they are raised in a defamation action and not in an invasion of privacy action.

■ Second, Appellant contends the circuit court erred in granting summary judgment to Newspaper on her cause of action for negligence pursuant to Rule 12(b)(6), SCRCP. We affirm the ruling of the circuit court. A claim that a statement constitutes libel or slander must be brought in a defamation cause of action, which is grounded in and affected by both common and constitutional law. Again, in affirming the dismissal of the negligence action, we do not intend to limit evidence Appellant may present about her damages. This defamation case was brought, argued, charged, and resolved in part on a negligence theory; therefore, the types of damages

generally available to a plaintiff who proves negligence are available to Appellant.

Third, Appellant contends the trial judge erred in granting a partial directed verdict on her allegation that the article may be read to say that Appellant was the guardian who had an illicit relationship with the father of the child she had been appointed to represent, a child who allegedly had been sexually molested by the father. Appellant asserts a reader may reasonably link the promotional teaser in the table of contents and introductory paragraph—both of which mentioned a guardian who had slept with a represented child's father—to Appellant. Appellant further notes two lawyers testified they understood the article to state she had slept with a represented child's father. We disagree with Appellant and affirm this ruling of the trial judge.

█ "[T]he intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous, but from the context; all of the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have." *Boone v. Sunbelt Newspapers, Inc.*, 347 S.C. 571, 582, 556 S.E.2d 732, 738 (Ct.App.2001) (quoting *Jones v. Garner*, 250 S.C. 479, 485, 158 S.E.2d 909, 912 (1968)).

The article states one guardian had been accused of sleeping with the father of a child she represented, and plainly identifies that guardian. We agree with the trial judge that a reading of the article as a whole would make clear to a reasonable reader the identity of the guardian linked to this allegation of wrongdoing. Consequently, Appellant may not recover damages for this statement because the trial judge properly ruled it did not refer to her and the jury's liability verdict was not based on it.

We affirm the trial judge's rulings on remaining issues raised by Appellant because it is unnecessary to address them given our disposition of this appeal. *See Whiteside*, 311 S.C. at 340, 428 S.E.2d at 889; Rule 220(c), SCACR.

## CONCLUSION

We reverse the trial judge's grant of a directed verdict to Newspaper on the issues of Appellant's status and liability for defamation. Appellant, as a matter of law under the facts and circumstances of this case, is a private-figure plaintiff who demonstrated Newspaper was liable for defaming her pursuant to a jury charge agreed upon by both parties. The jury determined by a preponderance of the evidence that the published statements were false and defamatory, and that Newspaper acted negligently in defaming Appellant as a private figure. These factual findings are supported by evidence in the record and will not be disturbed on appeal. The jury further determined Appellant had proven by clear and convincing evidence Newspaper acted with constitutional actual malice in publishing the statements. Our independent examination of the record reveals evidence which sufficiently supports the jury's finding of actual malice.

The case was bifurcated on liability and damages with the consent of both parties. Newspaper waived any objection it may have to bifurcation. Therefore, we reinstate the jury's verdict holding Newspaper liable for the defamatory statements. We remand this case for a jury to consider the issues of actual and punitive damages to Appellant. The trial judge's rulings on remaining issues raised by Appellant are affirmed.

**AFFIRMED IN PART; REVERSED IN PART.**

TOAL, C.J., MOORE, J., and Acting Justice CLYDE N. DAVIS, Jr., concur.

PLEICONES, J., concurring in part, dissenting in part in a separate opinion.

Justice PLEICONES:

I concur in part and dissent in part. I agree with the majority opinion that Appellant was a private figure and that the directed verdict on the defamation action should be reversed.[1] I respectfully dissent from the majority opinion's

---

1. I agree with the majority opinion that the partial directed verdict regarding the language in the article about a guardian's relationship

decision to "reinstate the jury's verdict holding Newspaper liable for defamatory statements." In my opinion, there is no jury verdict to reinstate, and I would therefore remand the case for a new trial on liability and damages.

As the majority observes, "the record contains no indication the trial judge initially submitted the case to jurors" for the purpose of rendering an advisory verdict. Further, the majority opinion correctly observes that Newspaper did not object to the trial judge's submission of the case to the jury despite Newspaper's having not yet presented a defense on liability. Because of this failure, Newspaper would ordinarily be bound by the jury's factual determinations. Appellant herself, however, never objected to the trial court's subsequent ruling that the jury's factual determinations were merely advisory. The court and the parties proceeded under the ruling that the jury had not yet delivered a verdict on liability, and the court directed a verdict in favor of Newspaper before the case was properly submitted to the jury. Finding no jury verdict to "reinstate," and finding the direction of a verdict improper, I would remand the case for a new trial on liability and damages.

---

with a man should be affirmed. I additionally agree with all other holdings in section IV of the majority opinion.