782 S.E.2d 406

**Mark KELLEY, Respondent,**

v.

**David WREN and Sun Publishing Company Inc., d/b/a The Sun News, Appellants.**

**Appellate Case No. 2014–001249.**
**No. 5375.**

Court of Appeals of South Carolina.

Heard Dec. 9, 2015.
Decided Jan. 13, 2016.
Rehearing Denied March 4, 2016.

Jerry Jay Bender, Baker Ravenel & Bender, LLP, of Columbia, for appellants.

James P. Stevens, Jr. and Natalie Shawn Stevens–Graziani, Stevens Law Firm, PC, of Loris, for respondent.

FEW, C.J.

David Wren and Sun Publishing Company, Inc. appeal from a jury verdict awarding $400,000 in actual damages and

$250,000 in punitive damages to Mark Kelley on Kelley's claims he was libeled by a series of articles Wren wrote for *The Sun News* of Myrtle Beach. We affirm.

## I. Facts and Procedural History

In 2010, David Wren, an investigative reporter for *The Sun News*, obtained information that South Carolina Republican gubernatorial candidate Gresham Barrett,[1] four Myrtle Beach City Council incumbents, and seven state legislators received significant campaign contributions from multiple limited liability companies (LLCs), many of which had few assets and no revenue. In the process of investigating the contributions, Wren learned about a 2009 lunch meeting involving Barrett, lobbyist Mark Kelley, and Myrtle Beach Area Chamber of Commerce president Brad Dean. At the meeting, Dean delivered to Barrett approximately $84,000 in campaign contributions.

Wren wrote three articles for *The Sun News* discussing various aspects of Myrtle Beach-area campaign contributions that he believed appeared unethical. Primarily, Wren's articles suggested the LLCs' contributions to Barrett and other local politicians were actually donations from the chamber of commerce, which passed the funds through the LLCs. Wren also discussed the lunch meeting involving Barrett, Dean, and Kelley in the articles. In the first article—published May 21, 2010—Wren wrote,

Mark Kelley, a lobbyist for the chamber of commerce, also attended that meeting, according to Barrett. . . .

There are strict rules that forbid lobbyists from facilitating campaign donations for statewide candidates; however, a spokeswoman for the S.C. Ethics Commission said it does not appear any laws were violated in this case.

"Just being in the same room is not a violation, it happens all the time," said . . . the commission's general counsel. "He [Kelley] is not supposed to touch the envelope or hand over the envelope."

---

1. Barrett was one of four candidates in the 2010 Republican primary for Governor. The other candidates were Henry McMaster, Andre Bauer, and the eventual winner, Nikki Haley.

In a second article—published May 23, 2010—Wren again mentioned the meeting and wrote, "Dean, along with chamber lobbyist Mark Kelley, delivered about $84,000 of those contributions to Barrett in June." On May 25, 2010, the newspaper published a third article authored by Wren that included a quote from the president of a Myrtle Beach-area interest group: " 'In the past, the chamber has denied any involvement in this scandal, but now Brad Dean admits he set up the lunch with [chamber] lobbyist Mark Kelley and he handed Mr. Barrett the envelope full of checks,' said Robert Kelley, who is not related to the lobbyist." Each of the articles contains at least one statement that the contributions were—or "appear to have been"—legal.

On May 30, 2010, the newspaper published an editorial in which it admitted it had little evidence to support its allegations that the chamber of commerce made illegal campaign contributions. However, it defended itself by arguing the contributions had an appearance of impropriety:

> The darkest accusation in this affair is that the money in question came directly from the Myrtle Beach Area Chamber of Commerce as a kickback for passing the 1 percent sales tax for tourism advertising, passed out to City Council members and state representatives who helped make it happen—and, inexplicably, Gresham Barrett in his bid for governor.
>
> There is virtually no evidence to prove this allegation, but there's a host of circumstance to make it plausible. As we now know based on David Wren's reporting, it was Myrtle Beach Area Chamber of Commerce President Brad Dean who personally handed the $84,000 in checks to Barrett, with lobbyist Mark Kelley sitting by his side. (If Kelley handed the money over, the transaction would have been explicitly illegal—effectively forcing Barrett to say Kelley had no involvement and pinioning the donations on Dean no matter what the unprovable truth is.)
>
> The chamber's defense all along has been that the checks came not from the chamber, but from the companies under whose name the donations were made. Dean says now that he simply collected and delivered them. Again, there is no evidence disproving this statement, but the circumstances make it difficult to believe.

Approximately two years after the newspaper published the articles and editorial, Kelley filed a lawsuit asserting libel claims against Wren and Sun Publishing—the publisher of *The Sun News*. Kelley claimed Wren and Sun Publishing falsely accused him in the articles and editorial of violating state ethics laws by delivering campaign contributions to Barrett. The trial court found Kelley—a former member of the State House of Representatives—to be a public figure,[2] and a jury awarded Kelley $400,000 in actual damages and $250,000 in punitive damages.[3]

## II. Law and Analysis

Wren and Sun Publishing raise five arguments on appeal: (1) the trial court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict (JNOV) because Kelley presented no evidence Wren or Sun Publishing made a false and defamatory statement of fact, (2) the trial court erred in denying their motions for a directed verdict and JNOV because Kelley failed to present clear and convincing evidence Wren wrote the articles with actual malice, (3) the trial court erred in admitting expert testimony about the standards of professional journalism, (4) the trial court erred in ruling the damages awards were not so grossly excessive as to warrant a new trial absolute, and (5) the punitive damages award violates the free press guarantees of the First and Fourteenth Amendments.

### A. Falsity

Wren and Sun Publishing argue the trial court erred in denying their motions for a directed verdict and JNOV because Kelley presented no evidence they made a false and defamatory statement of fact. *See Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006) (stating a plaintiff in a defamation case must prove the defen-

2. *See Elder v. Gaffney Ledger*, 341 S.C. 108, 113, 533 S.E.2d 899, 901 (2000) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964)) (stating a public figure plaintiff in a defamation action must prove actual malice to recover damages).

3. The jury found Sun Publishing did not make a defamatory statement in the editorial, and thus imposed liability based only on the articles.

dant made a false and defamatory statement). In ruling on motions for a directed verdict and JNOV on the question of falsity, the trial court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *See* 368 S.C. at 463, 629 S.E.2d at 663 (reciting the standard for a directed verdict); *see also RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331, 732 S.E.2d 166, 171 (2012) ("A motion for a JNOV is merely a renewal of the directed verdict motion."). The trial court should deny the motions where "the evidence is susceptible to more than one reasonable inference." *Erickson*, 368 S.C. at 463, 629 S.E.2d at 663. "When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." *Id.*

We find the trial court properly submitted the question of falsity to the jury. First, there is ample, unrefuted evidence in the record Kelley did not deliver campaign contributions to Barrett. At trial, Kelley testified he believed Wren and Sun Publishing accused him of delivering campaign contributions to a gubernatorial candidate, which is a crime under subsection 2–17–80(A) of the South Carolina Code (2005).[4] Kelley insisted he did not deliver the contributions, and Barrett testified Kelley never gave him campaign contributions or organized a campaign contribution meeting. Drea Byars—Barrett's aide who also attended the lunch meeting—testified Kelley did not deliver or touch the money Barrett received. Byars also stated Kelley did not know prior to the meeting that Dean planned to deliver the contributions. Moreover, Wren admitted at trial he had "[n]o evidence that [the money] came from Mark Kelley." Accordingly, any statement accusing Kelley of delivering contributions to Barrett is false.

Second, reading the articles in the light most favorable to Kelley, a reasonable jury could determine the articles—particularly the statement in the May 23 article that "Dean, along with chamber lobbyist Mark Kelley, delivered about $84,000 of

---

4. Subsection 2–17–80(A) provides, "A lobbyist ... shall not offer, solicit, facilitate, or provide to or on behalf of any member of the General Assembly, the Governor, the Lieutenant Governor, [or] any other statewide constitutional officer ... any of the following: ... (5) contributions, as defined in Section 8–13–1300(7)."

those contributions to Barrett"—accused Kelley of "delivering" campaign contributions and thus accused him of committing a crime. Kelley testified he believed the statement meant both he and Dean delivered contributions to Barrett. Kelley also presented several witnesses—including Barrett and State House of Representatives members Alan Clemmons, Nelson Hardwick, and George Hearn—who testified they believed Wren accused Kelley of committing a crime by delivering campaign contributions. Although Wren argues the phrase "along with" merely meant Kelley was present when Dean delivered the contributions, we find the statement in the May 23 article can reasonably be interpreted to mean Dean *and* Kelley delivered campaign contributions to Barrett. In fact, we believe a person reading the May 23 article would be far more likely to interpret the statement as an allegation of illegal conduct by Kelley than a mere statement he was present. Therefore, the issue of whether Wren accused Kelley of committing a crime by delivering contributions was a question of fact for the jury, and the trial court did not err in denying Wren's and Sun Publishing's motions for a directed verdict and JNOV.

## B. Actual Malice

Wren and Sun Publishing also argue the trial court erred in denying their motions for a directed verdict and JNOV because Kelley did not present clear and convincing evidence Wren wrote the articles with actual malice.

A public figure seeking damages for defamation must "prove by clear and convincing evidence" the defendant made the statement with actual malice, which means "with the knowledge of its falsity or with reckless disregard for its truth." *Elder*, 341 S.C. at 114, 533 S.E.2d at 902 (citing *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706).

> A "reckless disregard" for the truth ... requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). There must be evidence the defendant had a "high degree of

awareness of ... probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964).

*Elder,* 341 S.C. at 114, 533 S.E.2d at 902 (second alteration in original) (emphasis omitted).

■ "Whether the evidence is sufficient to support a finding of actual malice is a question of law." 341 S.C. at 113, 533 S.E.2d at 901–02. An appellate court in a public figure defamation case must conduct an independent review of the record to determine whether the evidence supports a jury finding by clear and convincing evidence the defendant made the statements with actual malice. 341 S.C. at 113–14, 533 S.E.2d at 901–02; *see also Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502, 523 (1984) ("Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' ").

> In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," *Bose Corp.,* 466 U.S. at 499–500, 104 S.Ct. at 1959, 80 L.Ed.2d at 516, the reviewing court must " 'examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect,' " *New York Times Co.,* 376 U.S. at 285, 84 S.Ct. at 728–29, 11 L.Ed.2d at 709.

*Harte–Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562, 589 (1989) (alterations in original).

Mindful that we must consider the entire factual record, we begin our analysis of the sufficiency of the evidence of actual malice by considering the statement in the May 23 article, "Dean, along with chamber lobbyist Mark Kelley, delivered about $84,000 of those contributions to Barrett." As discussed above in the section on falsity, this statement can be interpret-

ed to have two different meanings. When examining the sufficiency of the evidence as to falsity, we considered the objective question of whether the evidence supports an interpretation of the statement to be an accusation that Kelley participated in the delivery of the contributions. When examining the sufficiency of the evidence of actual malice, however, we must consider the subjective question of whether the evidence clearly and convincingly supports a finding that Wren intended to accuse Kelley of delivering the contributions, or that he wrote the articles with reckless disregard of the likelihood readers would interpret the statement—and the articles in general—to be such an accusation.

If Wren meant only that Kelley was present when Dean delivered the contributions, and Wren did not recklessly disregard the likelihood the statements could be otherwise interpreted, then our standard of review would require a finding that Wren did not have actual malice. However, if Wren intended to accuse Kelley of delivering the contributions, or if he recklessly disregarded the likelihood the articles could be interpreted to accuse Kelley of delivering the contributions, he may have had actual malice. In answering this question of what Wren meant, we have considered the entire record— including the statements in the articles that the contributions were legal. We also consider emails Wren sent to several people during his investigation into the campaign contributions. While we are careful not to find actual malice based on Wren's other actions, see Elder, 341 S.C. at 114, 533 S.E.2d at 902 (warning "the actual malice standard is not satisfied merely through a showing of ill will" and "[i]t is insufficient to show the defendant made an editorial choice or simply failed to investigate or verify information"), Wren's emails help us understand what Wren intended in his articles, particularly the May 23 article.

Wren first learned about the lunch meeting involving Kelley, Dean, and Barrett from state representative Tracy Edge. On May 3, 2010, Wren exchanged several emails with Edge with the following subject line: "I called [T]rey [W]alker [5] and he denied knowing anything about it." In one of the emails, Wren stated,

---

5. Trey Walker worked for McMaster's campaign.

I told him that we were talking about the checks earlier today and you had told me that Walker had some e-mails from the Barrett campaign that would show Mark Kelley distributed donations to [Barrett]. . . . Walker flat out denied knowing anything about anything. Basically called you a liar. Now I'm really confused. I know campaign managers have little or no ethics, but to flat out lie about something that eventually will be shown to be true isn't going to help him.

On May 23, 2010, Wren sent an email to Justin Stokes and Tim Pearson.[6] In the email, Wren stated,

[E]veryone seems to be bending over backward to protect Mark Kelley regarding his involvement in setting up the meeting with Barrett and handing him the money. I asked B.J. [Boling][7] if Kelley had arranged the meeting and he quickly said, "No, that would have been illegal." Then he said he had to check and see who did arrange the meeting. A little while later he called back and said it was Brad Dean.

Wren also wrote in the May 23 email,

I'm trying to piece together who raised all the money . . . and why the chamber picked Barrett as the candidate they were going to endorse (could it be anything besides the fact that Kelley is the chamber lobbyist and a big supporter of Barrett?) . . . Also, if there are any e-mails or documents that show . . . Kelley's role in setting up the Barrett meeting [sic] would be a great help.

On May 27, 2010, Wren sent an email to Pearson stating,

I wanted to check back with you and see if there is any way we can use the e-mails from Barrett's campaign that seem to show the involvement of Brad Dean and Mark Kelley in raising money for Barrett and others. . . . Recent events have overshadowed the campaign funding issue and I'm looking for ways to move that story forward.

At trial, Wren admitted Dean and Barrett both told him Dean delivered the contributions. He also admitted he had no evidence Kelley delivered campaign contributions or set up a

---

6. Stokes was Barrett's former deputy campaign manager, and Pearson was Haley's campaign manager.

7. Boling was the communications director for the Barrett campaign.

meeting at which Barrett received contributions. He testified, "I have no evidence that Mark Kelley knew what was in the envelope or where it came from and I never said he knows what's in the envelope or where it came from." Furthermore, he testified his only indication that Kelley was involved with the campaign contributions is a 2009 email from Stokes to Boling in which Stokes stated Kelley would be familiar with the contributions from the LLCs and "where they came from."

The record in this case contains no evidence Kelley participated in delivering the money to Barrett. Wren testified on cross-examination he was aware of "no evidence that [the money] came from Mark Kelley." The question before us on the sufficiency of the evidence of actual malice, therefore, is not whether Wren knew that an accusation against Kelley was false—Wren clearly knew that. The question rather is whether Wren knew, or recklessly disregarded, that he was making the accusation. In light of the fact that Wren so diligently pursued a story about Kelley making illegal campaign contributions—and found no evidence to support such a claim—we find it difficult to believe Wren did not recognize that including the clause "along with chamber lobbyist Mark Kelley" in the second article would be read as an accusation against Kelley.

Other evidence in the record supports our conclusion. In the first article, Wren focused the reader on Kelley's involvement by citing the "strict rules" against it and quoting the ethics commission's general counsel that a lobbyist can be "in the same room" but cannot "touch the envelope." The first article, therefore, set the context—whether Kelley violated state law—for the statement in the second article. In the third article, Wren included a quote stating, "Brad Dean admits he set up the lunch with [chamber] lobbyist Mark Kelley and he handed Mr. Barrett the envelope full of checks." The quote suggests Dean meant the "he" who handed the checks to Barrett was Kelley, but Wren clearly knew Dean did not say Kelley delivered the checks.

Our supreme court has defined clear and convincing evidence as "that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established." *Peeler v. Spartan Radiocasting, Inc.,* 324 S.C. 261, 265 n. 4, 478 S.E.2d 282, 284 n. 4 (1996). Based on

the entire record in this case, including the testimony and emails described above, we find the evidence is sufficient to support a firm belief on the part of the jury that Wren knew the statement in the May 23 article was an accusation that Kelley committed a crime Wren knew Kelley did not commit. Considering the entire record, and considering this statement in context and not in isolation, we find the evidence supporting the jury's determination that Wren acted with actual malice is clear and convincing evidence. Therefore, we affirm the trial court's denial of the motions for a directed verdict and JNOV.

## C. Expert Testimony

■ Wren and Sun Publishing argue the trial court erred in admitting expert testimony about the "standards of professional journalism" because the evidence allowed Kelley to prevail on a negligence standard of proof, rather than the constitutional actual malice standard.[8]

■ The qualification of an expert witness and admissibility of his testimony is within the discretion of the trial court. *Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 25, 609 S.E.2d 506, 509 (2005). We find the record supports a determination that Dr. William Lee—a University of Georgia journalism professor qualified by the trial court as an expert witness—was qualified, his testimony assisted the trier of fact, and his testimony met the requirement of reliability. *See Watson v. Ford Motor Co.*, 389 S.C. 434, 446, 699 S.E.2d 169, 175 (2010) (requiring as a foundation for the admission of expert testimony (1) the witness is qualified, (2) the testimony will assist the trier of fact, and (3) the method by which the witness reached the opinion is reliable). Therefore, the trial court did not abuse its discretion in admitting Dr. Lee's testimony.

Wren and Sun Publishing also argue Dr. Lee's testimony was not relevant. Specifically, they contend the testimony did not assist the trier of fact because it applied an incorrect standard of proof—negligence, instead of actual malice. We hold the trial court did not err in admitting Dr. Lee's testimo-

---

8. Kelley argues this issue is unpreserved because Wren and Sun Publishing did not contemporaneously object to the expert's testimony. We find the issue is preserved.

ny. Although some of Dr. Lee's testimony concerned professional standards and whether Wren and Sun Publishing conformed to those standards, he focused primarily on whether the evidence indicated Wren had substantial doubt as to the truth of the statements he published in the articles or had a reckless disregard for their truth or falsity. Thus, the crux of Dr. Lee's testimony was that Wren knowingly published a false statement with actual malice—the central issue in the case—not that he should be held liable for deviating from professional standards. Therefore, the testimony was relevant because it assisted the jury in determining the central issue in the case.

Finally, Wren's and Sun Publishing's argument as to the standard of proof relates to the jury charge, not the admission of evidence. The trial court correctly charged the jury Kelley could not recover unless he proved actual malice by clear and convincing evidence, and Wren and Sun Publishing did not object to that portion of the charge.

Accordingly, we find the trial court did not abuse its discretion in admitting Dr. Lee's testimony.

### D. New Trial Absolute

■ Wren and Sun Publishing argue the trial court erred in denying their motion for a new trial absolute.

■ A trial court may grant a new trial absolute "only when the verdict 'is shockingly disproportionate to the injuries suffered and thus indicates that passion, caprice, prejudice, or other considerations not reflected by the evidence affected the amount awarded.'" *Burke v. AnMed Health*, 393 S.C. 48, 56, 710 S.E.2d 84, 88 (Ct.App.2011) (quoting *Becker v. Wal–Mart Stores, Inc.*, 339 S.C. 629, 635, 529 S.E.2d 758, 761 (Ct.App. 2000)). The trial court and this court must give "substantial deference" to the jury's determination of damages. *Id.* (quoting *Todd v. Joyner*, 385 S.C. 509, 517, 685 S.E.2d 613, 618 (Ct.App.2008), *aff'd*, 385 S.C. 421, 685 S.E.2d 595 (2009)). Whether the verdict is so excessive as to require a new trial is within the discretion of the trial court. *Id.*

In denying the motion for a new trial absolute as to the actual damages award, the trial court considered testimony indicating the articles damaged Kelley's reputation—particu-

larly testimony that legislators believed Kelley was "toxic" after Wren published the articles. The trial court ruled "the evidence that was presented in this case does support a verdict of $400,000." As to punitive damages, the trial court found the jury "made specific findings of malice, clear and convincing proof of malice on the part of the reporter and the paper in this case and ... th[e] award of $250,000 as punitive damages is justified."

We find the trial court acted within its discretion in denying the motion. Clemmons testified that before Wren published the articles, Kelley's reputation was "excellent" and his firm had a good reputation among state legislators. However, he testified the articles damaged Kelley's personal and professional reputation. When asked whether he would want to be seen in public with Kelley after the articles, Clemmons stated, "Absolutely not." Moreover, Clemmons testified he told an organization looking for lobbyists that in his opinion, "as a lobbyist Mark Kelley was toxic at that time because of everything that had been in *The Sun News.*" Hardwick and Barrett also testified the articles damaged Kelley's reputation. Additionally, Kelley testified the articles caused him significant embarrassment and stress. Therefore, we hold the trial court did not abuse its discretion in denying the motion for a new trial absolute.

### E. Punitive Damages Against a Media Defendant

█ Wren and Sun Publishing argue awarding punitive damages against a media defendant violates the free press guarantees of the First and Fourteenth Amendments.

There is ample authority under both South Carolina and federal law that a jury can award punitive damages against a media defendant when the plaintiff meets the appropriate standard of proof. *See Holtzscheiter v. Thomson Newspapers, Inc.,* 332 S.C. 502, 512, 506 S.E.2d 497, 503 (1998) (holding a private plaintiff may recover punitive damages from a media defendant if he proves by clear and convincing evidence the defendant acted with actual malice); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 774, 106 S.Ct. 1558, 1562, 89 L.Ed.2d 783, 791 (1986) (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 348–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789, 810–11 (1974)) (stating a private plaintiff must show actual malice

to recover punitive damages against a media defendant). Here, the jury found Wren and Sun Publishing published the accusations against Kelley with actual malice, and we find there is clear and convincing evidence to support the finding. Therefore, an award of punitive damages in this case does not violate the constitutional rights of Wren and Sun Publishing.

### III. Conclusion

The verdicts against Wren and Sun Publishing are **AF-FIRMED.**

KONDUROS, J., and CURETON, A.J., concur.