# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

David T. Stokes, Appellant,

v.

Oconee County, Wayne McCall, and Edda Cammick, Respondents.

Appellate Case No. 2019-001648

———————

Appeal From Oconee County
R. Lawton McIntosh, Circuit Court Judge

———————

Opinion No. 6033
Heard February 16, 2023 – Filed November 8, 2023

———————

**AFFIRMED**

———————

Joseph Clay Hopkins, of Charleston, for Appellant.

Stephanie Holmes Burton, of Gibbes Burton, LLC, of Spartanburg, and Roberta Elizabeth Barton, of Roberta Barton Law, Ltd. Co., of Seneca, both for Respondent Wayne McCall.

James W. Logan, Jr., and Stacey Todd Coffee, both of Logan & Jolly, LLP, of Anderson, and Roberta Elizabeth Barton, of Roberta Barton Law, Ltd. Co., of Seneca, all for Respondent Edda Cammick.

James W. Logan, Jr., and Stacey Todd Coffee, of Logan & Jolly, LLP, of Anderson, both for Respondent Oconee County.

———————————

**GEATHERS, J.:** In this defamation action, Appellant David T. Stokes seeks review of the circuit court's rulings granting summary judgment to Respondents Wayne McCall and Edda Cammick and denying Stokes's motion to amend his complaint. Stokes also challenges the circuit court's ruling quashing a subpoena Stokes served on the Administrator for Respondent Oconee County (the County). Stokes argues that (1) Councilman McCall and Councilwoman Cammick were not entitled to immunity under the South Carolina Tort Claims Act because their alleged misconduct fell outside the scope of these council members' official duties; (2) the proposed amendment to his complaint would not have been futile because the alleged defamatory statements were not material to the purpose of the meeting at which they were made; and (3) Stokes was entitled to serve a subpoena on the County Administrator in his individual capacity because his prior deposition was taken in his capacity as a representative of the County pursuant to Rule 30(b)(6), SCRCP. We affirm the circuit court's orders granting summary judgment to McCall and Cammick and denying the motion to amend. We decline to address the circuit court's ruling quashing the subpoena as it is not immediately appealable.

## FACTS/PROCEDURAL HISTORY

David Stokes worked as the County's "Building Official" from December 2011 to May 2017. "The Building Official is the administrator for building and/or code compliance within Oconee County[] and ensures that proper code is followed in the design, construction, and maintenance of buildings and structures within Oconee County." As such, Stokes oversaw the work of the Building Department's staff. In fall 2016, two county council members, Councilman McCall and Councilwoman Cammick, had several discussions with the County Administrator, Scott Moulder, about complaints the council members had received concerning various county departments, including the Building Department (the Department).[1] McCall and Cammick told Moulder that "they wanted the matters cured" and Moulder's job depended on the "departure" of certain individuals responsible for the departments in question.

---

[1] For ease of discussion, we henceforth refer to the council members by their last names only. No disrespect is intended.

In March 2017, Cammick shared with McCall her personal experience with the Department when she had applied for a freestanding carport permit. A Department employee, Cynthia Adams, advised Cammick that she needed stamped engineering plans, and a second employee in that office, Casey Neal, asked Cammick where she purchased her carport. According to Cammick, when she told Neal that she purchased her carport from a certain business, Neal shook her head and stated, "They don't help their customers. They . . . won't help you with the building permit process. They won't help you get the documents[.]"

Additionally, Cammick questioned why plans, or even the permit itself, were required for her carport. According to Stokes, Neal requested that he personally meet with Cammick to explain the need for the permit and plans. While Stokes explained to Cammick the reason for these requirements, Adams gave Stokes a sample set of engineering plans to show to Cammick. When Stokes showed Cammick the example, Cammick stated, "You are trying to push me to buy from this guy."[2] Two days later, Cammick returned to the Department to submit the plans for her carport, and the Department e-mailed a copy of the permit to her the following day.

In April 2017, a builder contacted McCall to complain about a Department inspector who failed to appear for an inspection. Because Moulder was on vacation, McCall telephoned Cammick, who contacted Stokes to learn more about the matter and to ask Stokes to "take care of it." When Stokes told Cammick the inspector had a flat tire, Cammick stated that it "was kind of a lame excuse."

Subsequently, at the April 25, 2017 meeting of the county council's Budget, Finance, and Administration Committee, McCall recounted certain citizen complaints about the Department, and Cammick recounted her experience with the Department when she obtained her carport permit. Several statements made about the Department comprise the basis for this defamation action, and the pertinent parts of the meeting transcript are copied into one of two addenda attached to this opinion. (Addendum I). For example, McCall quoted the complaint of a constituent in response to McCall's suggestion that the constituent lodge a complaint: "I'm not saying a word 'cause [if] you make them mad[,] they will make life miserable for you." McCall also relayed a complaint that the Department was making up the rules as they went along and accused the Department of having "a sweet deal going" by "funneling people down to" a certain carport business.

---

[2] Stokes explained that he was just using the plans as an example. Cammick later denied that she met with Stokes to discuss her permit application.

Two days after the committee meeting, Moulder met with Stokes to advise him that he would be terminated unless he chose to resign. On the following day, the Oconee County newspaper, *The Journal*, published an article entitled "Oconee, building codes director part ways." The article's contents are copied into a second addendum attached to this opinion. (Addendum II).

On May 1, 2017, Moulder terminated Stokes. Subsequently, Stokes filed a grievance with the County over his termination, and the County's Grievance Committee recommended that the County either produce tangible evidence to refute Stokes's discipline-free personnel file or fully reinstate Stokes with back pay. Nevertheless, Moulder upheld the termination.

According to Stokes, people he knew in the community began to avoid him or had terse conversations with him. He also testified that two or three contractors and certain employees of the City of Seneca told his son, "Your dad's a crook," and "[he] got what he deserved." Another contractor told Stokes, "I heard that stuff," but "I didn't believe it."

Some of Stokes's former employees advised him that a video recording of the April 25 meeting on the County's YouTube channel showed accusations of criminal conduct within the Department. Stokes viewed the recording, and by the end of the month, he filed this defamation action against the County, McCall, and Cammick. The complaint included causes of action for slander per se and wrongful termination. The County and Cammick filed counterclaims for abuse of process and "frivolous lawsuit." Similarly, McCall filed counterclaims for defamation and "frivolous lawsuit."

Subsequently, the County and Cammick filed a joint motion for summary judgment, and McCall filed a separate summary judgment motion. Both motions listed multiple grounds, including immunity under the South Carolina Tort Claims Act.[3] At the motions hearing, Stokes advised the circuit court that he would be filing a motion to amend his complaint to bring claims against Cammick and McCall in their individual capacities, and he did so approximately one week later.

On June 14, 2019, the circuit court issued a Form 4 order denying summary judgment to Cammick and McCall on their abuse of process counterclaims but granting them summary judgment as to Stokes's slander per se claim and dismissing

_____

[3] S.C. Code Ann. §§ 15-78-10 to -220 (2005 & Supp. 2022).

them from this action.  The circuit court also granted summary judgment to the County on Stokes's slander per se claim but denied the County's summary judgment motion as to Stokes's claim for wrongful termination.  The circuit court later issued a full written order concluding that Stokes did not sue Cammick and McCall in their individual capacities and even if he had, it would have been improper pursuant to the Tort Claims Act, specifically section 15-78-70 of the South Carolina Code (2005 & Supp. 2022), which requires a government agency or political subdivision to be substituted as the party defendant for a government employee named individually in a tort action.[4]

---

[4] Section 15-78-70 provides, in pertinent part,

> (a) This chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided for in subsection (b).

> (b) Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties *or* that it constituted actual fraud, *actual malice*, intent to harm, or a crime involving moral turpitude.

> (c) . . .

> On or after January 1, 1989, a person, when bringing an action against a governmental entity under the provisions of this chapter, shall name as a party defendant *only the agency or political subdivision for which the employee was acting* and is not required to name the employee individually, unless the agency or political subdivision for which the employee was acting cannot be determined at the time the action is instituted. *In the event that the employee is individually named, the agency or political subdivision for which the employee was acting must be substituted as the party defendant.*

The court also concluded there was no evidence that either Cammick or McCall acted outside of their official capacities as council members and they were absolutely privileged to make the statements in question in the course of their legislative functions.[5] As to Stokes's slander per se claim against the County, the court concluded that Stokes failed to produce sufficient evidence of actual malice and even if he had, section 15-78-60(17) relieves a governmental entity from liability for loss resulting from employee conduct constituting actual malice.[6] Additionally, the circuit court concluded that Stokes failed to show that the statements in question were directed at Stokes individually or that they were false.

On August 6, 2019, the circuit court conducted a hearing on Stokes's motion to amend. In its written order denying the motion, the circuit court stated that Stokes failed to present sufficient evidence "that Cammick or McCall acted outside of their official capacities as [council members]," and "[a]s a result thereof, Cammick and McCall cannot be sued in their individual capacities under section 15-78-70, so adding them as individual defendants would be futile." The court cited absolute legislative privilege as an additional basis for futility. This appeal followed.

## LAW/ANALYSIS

### I.    Summary Judgment

Stokes argues that the circuit court erred by granting summary judgment to McCall and Cammick because their alleged misconduct fell outside the scope of these council members' official duties and, therefore, they were not entitled to immunity under the Tort Claims Act. We affirm the circuit court's order on the basis

---

(emphases added). "'Scope of official duty' . . . means (1) acting in and about the official business of a governmental entity and (2) performing official duties." S.C. Code Ann. § 15-78-30 (2005).

[5] The court was referencing the common law privilege, which has been codified in the Tort Claims Act. Specifically, section 15-78-60(1) states: "The governmental entity is not liable for a loss resulting from . . . legislative, judicial, or quasi-judicial action or inaction[.]"

[6] Section 15-78-60 provides several exceptions to the general waiver of immunity set forth in section 15-78-20. Subsection 17 of section 15-78-60 sets forth the exception for "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude."

that Stokes failed to produce sufficient evidence of at least two elements of his slander per se claim. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal."); *Hansson v. Scalise Builders of S.C.*, 374 S.C. 352, 357, 650 S.E.2d 68, 71 (2007) (holding that Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case[] and on which that party will bear the burden of proof" (first alteration in original) (quoting *Baughman v. Amer. Tel. & Tel. Co.*, 306 S.C. 101, 116, 410 S.E.2d 537, 545–46 (1991))). Therefore, we decline to address the issue of immunity.

### A. Defamation Law

> To prove defamation, the plaintiff must show (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*McBride v. Sch. Dist. of Greenville Cnty.*, 389 S.C. 546, 559–60, 698 S.E.2d 845, 852 (Ct. App. 2010). Further, slander

> is actionable per se when the defendant's alleged defamatory statements charge the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession. In a defamation action that is actionable per se, general damages are presumed and need not be proven by the plaintiff.

*Goodwin v. Kennedy*, 347 S.C. 30, 36–37, 552 S.E.2d 319, 322–23 (Ct. App. 2001) (citation omitted). In the present case, the alleged defamatory statements concern unfitness in one's profession, and therefore, damages are presumed.

Regarding the element of fault, a public-official plaintiff must prove the statements were made with actual malice. *See Elder v. Gaffney Ledger*, 341 S.C. 108, 114, 533 S.E.2d 899, 902 (2000) ("The constitutional actual malice standard requires a public official to prove by clear and convincing evidence that the

defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for its truth."); *see also Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 513 n.9, 506 S.E.2d 497, 503 n.9 (1998) ("The presumption of common law actual malice cannot substitute for the requirement of proof of constitutional actual malice in a case where the First Amendment is involved."); *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 468, 629 S.E.2d 653, 666 (2006) ("Actual malice . . . should not be confused with the concept of [common law] malice as an evil intent or a motive arising from spite or ill will." (alteration in original) (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991))). Stokes concedes that he was a public official when the alleged defamatory statements were made.

"When ruling on a motion for summary judgment or directed verdict in a defamation action, the court must review the evidence *using the same substantive evidentiary standard of proof the jury is required to use* in a particular case." *Erickson*, 368 S.C. at 464, 629 S.E.2d at 663 (emphasis added). "An appellate court reviews the granting of such a motion using the same standard." *Id.* When the element of constitutional actual malice is required to show fault, as in cases involving a plaintiff who is a public official, "the appropriate standard at the summary judgment phase on [that] issue . . . is the clear and convincing standard." *George v. Fabri*, 345 S.C. 440, 454, 548 S.E.2d 868, 875 (2001); *see also Hancock v. Mid-S. Mgmt. Co.*, 381 S.C. 326, 330 n.2, 673 S.E.2d 801, 803 n.2 (2009), *overruled on other grounds by The Kitchen Planners, LLC v. Samuel E. Friedman, et al.*, 440 S.C. 456, 892 S.E.2d 297 (2023) (referencing the clear and convincing standard for summary judgment in a libel action brought by a public official as an example of a case requiring a heightened burden of proof). "Unless the [circuit] court finds, based on pretrial affidavits, depositions[,] or other documentary evidence, that the plaintiff can prove actual malice, it should grant summary judgment for the defendant." *McClain v. Arnold*, 275 S.C. 282, 284, 270 S.E.2d 124, 125 (1980).

As we explain below, we conclude that Stokes—a public-official plaintiff— failed to produce sufficient evidence of actual malice and also failed to show that the statements in question were directed at Stokes individually or that they were false. *See Neeley v. Winn–Dixie Greenville, Inc.*, 255 S.C. 301, 308, 178 S.E.2d 662, 665 (1971) (stating that in a defamation action, the challenged statement must "be such that persons reading or hearing it will, in the light of surrounding circumstances, be able to understand that it refers to the person complaining, and it must have been so understood by at least one other person" (quoting 50 Am. Jur. 2d *Libel and Slander* § 143)); *Burns v. Gardner*, 328 S.C. 608, 615, 493 S.E.2d 356, 359 (Ct. App. 1997) ("To prevail in a defamation action, the plaintiff must establish that the defendant's

statement referred to some ascertainable person and that the plaintiff was the person to whom the statement referred.").

*B. False Message*

In *The New York Times Company v. Sullivan*, the plaintiff, a city commissioner who oversaw the police department for the City of Montgomery, Alabama, filed a libel action against the New York Times Company and several individuals, claiming that a full-page advertisement in the Times, which described a "wave of terror" against civil rights activists and sought financial support for their efforts, included false and defamatory statements about the commissioner. 376 U.S. 254, 256–58 (1964). The following statements were the basis of the commissioner's libel claim:

> In Montgomery, Alabama, after students sang "My Country, 'Tis of Thee" on the State Capitol steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission.
>
> . . . .
>
> Again and again the Southern violators have answered Dr. [Martin Luther] King[, Jr.]'s peaceful protests with intimidation and violence. They have bombed his home[,] almost killing his wife and child. They have assaulted his person. They have arrested him seven times—for "speeding," "loitering" and similar "offenses." And now they have charged him with "perjury"—a felony under which they could imprison him for ten years.

376 U.S. at 257–58. The Court recounted the commissioner's assertions as follows:

> Although neither of these statements mentions [the commissioner] by name, he contended that the word "police" in the third paragraph referred to him as the Montgomery Commissioner who supervised the Police

Department, so that he was being accused of "ringing" the campus with police. He further claimed that the paragraph would be read as imputing to the police, and hence to him, the padlocking of the dining hall in order to starve the students into submission. As to the sixth paragraph, he contended that since arrests are ordinarily made by the police, the statement "They have arrested (Dr. King) seven times" would be read as referring to him; he further contended that the "They" who did the arresting would be equated with the "They" who committed the other described acts and with the "Southern violators." Thus, he argued, the paragraph would be read as accusing the Montgomery police, and hence him, of answering Dr. King's protests with "intimidation and violence," bombing his home, assaulting his person, and charging him with perjury. [The commissioner] and six other Montgomery residents testified that they read some or all of the statements as referring to him in his capacity as Commissioner.

376 U.S. at 258 (footnote omitted). The Court observed:

Although the statements may be taken as referring to the police, they did not on their face make even an oblique reference to [the commissioner] as an individual. Support for the asserted reference must, therefore, be sought in the testimony of [the commissioner's] witnesses. *But none of them suggested any basis for the belief that [the commissioner] himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department and thus bore official responsibility for police conduct*; to the extent that some of the witnesses thought [the commissioner] to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they based this notion not on any statements in the advertisement, and not on any evidence that he had in fact been so involved, but solely on the unsupported assumption that, because of his official position, he must have been.

376 U.S. at 289 (emphasis added).   The Court held such an assumption was unconstitutional:

> [S]uch a proposition may not constitutionally be utilized to establish that an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations.  Since it was relied on exclusively here, and *there was no other evidence to connect the statements with [the commissioner]*, the evidence was constitutionally insufficient to support a finding that the statements referred to [the commissioner].

*Id.* at 292 (emphasis added); *see also Hosp. Care Corp. v. Com. Cas. Ins. Co.*, 194 S.C. 370, 377, 9 S.E.2d 796, 800 (1940) ("Where a publication affects a class of persons without any special personal application, no individual of that class can sustain an action for the publication[.]" (quoting 36 C.J. § 26)); *id.* ("[W]here defamatory statements are made against an aggregate body of persons, an individual member not specially imputed or designated cannot maintain an action." (quoting 36 C.J. § 26)); *Holtzscheiter*, 332 S.C. at 508, 506 S.E.2d at 501 ("The tort of defamation allows a plaintiff to recover for injury to her reputation as the result of the defendant's communication to others of a false message *about the plaintiff*." (emphasis added)).

In the present case, the alleged defamatory statements did not reference Stokes's name and did not communicate any false message about him as an individual.  Nor could these statements, by themselves, be reasonably interpreted to have any "special personal application" to Stokes.  Similar to the references in *Sullivan*, the references here included "the Building Codes Department," "the Department," "they," and "them."

Although McCall mentioned that Cammick called "the head of the Building Codes," this was describing Cammick's investigation into a contractor's complaint about a specific unnamed inspector who failed to appear for an inspection.  The "natural and reasonable import" of this sole reference to Stokes as an individual is that when Cammick called Stokes about a scheduling issue with a building inspector, Stokes explained that the inspector had a flat tire.  *Cf. Burns*, 328 S.C. at 615, 493 S.E.2d at 360 (addressing the language in an advocacy group's position paper and stating that this court would not "hunt for a forced and strained construction to put on ordinary words, but will construe them fairly, according to their natural and reasonable import, in the plain and popular sense in which the average reader

naturally understands them" (quoting *Hosp. Care Corp.*, 194 S.C. at 379, 9 S.E.2d at 800)). In his deposition, Stokes confirmed that the reason for the scheduling problem in question was that the inspector had a flat tire. Further, the statement that the flat tire was "a lame excuse" was directed at the unnamed inspector.

We acknowledge that when Stokes viewed the meeting video on the County's YouTube channel, he could have connected some of the statements about carports with himself because of his personal involvement in the permit transaction with Cammick. However, the language used in the committee meeting, by itself, could not be reasonably interpreted by someone with no personal knowledge of the transaction as referring to Stokes. *Cf. Holtzscheiter*, 332 S.C. at 514, 506 S.E.2d at 504 (rejecting the newspaper's argument that a murder victim's mother failed to prove the statement that the victim lacked family support was "of and about her" when "there was evidence from which a jury could have found the statement was 'of and about'" the mother); *id.* ("While the general rule is that defamation of a group does not allow an individual member of that group to maintain an action, this rule is not applicable to a small group."). Stokes has not indicated how many individuals worked for the Department at that time, and we have not seen this information in the record. Therefore, we do not consider the Department to be a small group. *See Duckett by Duckett v. Payne*, 279 S.C. 94, 96, 302 S.E.2d 342, 343 (1983) ("[T]he appellant carries the burden of convincing this [c]ourt that the trial court erred.").

Stokes argues for the first time in his Reply Brief that (1) the act of termination may be considered defamation under South Carolina law, and (2) the fact that Stokes was terminated only a few days after the committee meeting made it clear that McCall and Cammick were referring to him when they made the alleged defamatory statements. First, this argument is not properly preserved. *See ABB, Inc. v. Integrated Recycling Grp. of SC, LLC*, 432 S.C. 545, 553, 854 S.E.2d 171, 175 (Ct. App. 2021) ("[A] party cannot raise an issue for the first time in an appellate reply brief."). Further, there is no evidence to indicate that the basis for Moulder's termination of Stokes was anything other than Stokes's mere official responsibility for the conduct of his staff.

We also acknowledge that the April 28, 2017 article in *The Journal* inferred a connection between Stokes' termination and the content of the alleged defamatory statements. However, nothing in the article indicates that the author made this connection on the basis of anything other than Stokes's official responsibility for the conduct of his staff. *Cf. Sullivan*, 376 U.S. at 289 (stating that none of the city commissioner's witnesses "suggested any basis for the belief that [the commissioner] himself was attacked in the advertisement beyond the bare fact that he was in overall

charge of the Police Department and thus bore official responsibility for police conduct").

As to the treatment Stokes received from members of the community after his termination, he did not present any evidence showing the basis for their connection between the alleged defamatory statements and Stokes as an individual. *Cf. Sullivan*, 376 U.S. at 289 (stating that none of the city commissioner's witnesses "suggested any basis for the belief that [the commissioner] himself was attacked in the advertisement beyond the bare fact that he was in overall charge of the Police Department and thus bore official responsibility for police conduct"). Moreover, as we explain below, we question whether there is sufficient evidence of the falsity of *any* of the statements made by McCall and Cammick. Contrary to counsel's assertion during oral argument, deposition testimony stating that a witness knows of no evidence to support the statements in question does not constitute evidence of the falsity of those statements.

Based on the foregoing, Stokes failed to establish that the alleged defamatory statements communicated false messages about Stokes as an individual.

*C. Actual Malice*

Stokes also failed to show clear and convincing evidence of actual malice. "The constitutional actual malice standard requires a public official to prove by clear and convincing evidence that the defamatory falsehood was made with the knowledge of its falsity or with reckless disregard for its truth." *Elder*, 341 S.C. at 114, 533 S.E.2d at 902. Further, this standard applies even at the summary judgment stage. *George*, 345 S.C. at 454, 548 S.E.2d at 875.

Here, even in the light most favorable to Stokes, the evidence is less than clear and convincing. The standard for whether a defendant showed reckless disregard for the truth is a strict one:

> A "reckless disregard" for the truth . . . requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that the defendant **in fact entertained serious doubts as to the truth** of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (emphasis supplied). There must be evidence the defendant had a **"high degree of awareness**

> **of . . . probable falsity**." *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (emphasis supplied).
>
> Failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. Actual malice may be present, however, where one fails to investigate *and there are obvious reasons to doubt the veracity of the informant*.
>
> The actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. It is insufficient to show the defendant made an editorial choice or simply failed to investigate or verify information; there must be evidence at least that the defendant purposefully avoided the truth.

*Elder*, 341 S.C. at 114, 533 S.E.2d at 902 (third emphasis added) (some citations omitted).

First, there is insufficient evidence of the falsity of the statements made by McCall and Cammick. The clearest example of falsity is the following statement: "[T]hey sold Ms. Cammick a building permit." The implication was that the permit was unnecessary, and therefore, the Department's collection of a fee for the permit was unethical. Yet, in her deposition, Cammick admitted Moulder confirmed that the county code required the permit.

Nevertheless, Cammick's knowledge of what Moulder confirmed cannot be transferred to McCall, who made the statement in question. Thus, there is no evidence that McCall had the requisite "'high degree of awareness of . . . probable falsity.'" *Elder*, 341 S.C. at 114, 533 S.E.2d at 902 (quoting *Garrison*, 379 U.S. at 74). Further, it is unreasonable to infer from Cammick's preceding statements that she thought the permit was unnecessary in light of her testimony that although she understood the code required her to obtain a permit, she did not understand why the code would require a building permit for something that was not considered real estate. *See Osborne*, 346 S.C. at 7, 550 S.E.2d at 321 ("In determining whether any triable issues of fact exist, the evidence and all *reasonable* inferences therefrom must be viewed in the light most favorable to the non-moving party." (emphasis added)). The explanation in her testimony is consistent with her actual words in the

committee meeting, quoting the assessor who appeared at her home: "'What am I doing here? This isn't a permanent structure. . . . [T]his isn't going to be included in your assessment.'"

Moreover, we have found no probative evidence of the falsity of the other alleged defamatory statements, and this necessarily impacts Stokes's ability to show actual malice.[7] Further, although Stokes's testimony denies the truth of the alleged defamatory statements, he may not have had personal knowledge of any "sweet deal" his *employees* could have arranged or any misapplication of the code by his inspectors.

As to reckless disregard for the truth, McCall made the following statement about contractors' complaints during his deposition:

> Well, you get calls all the time from builders. Sometimes – and *you have to take all of them with a grain of salt. You don't know whether they are true or not*, but then over the course of time, the same complaints keep surfacing from different people over and over again. Then at one point, apparently it reached a boiling point and all these builders showed up at my shop. . . . [B]ut the same complaint comes over and over again. The complaint is that -- once again, I am not a builder, but they said they are making the rules up.

(emphasis added).

Later in McCall's deposition, the following exchange occurred:

> Q. Do you recall saying that the building codes department had a sweet deal going?
>
> A. Yes, sir.

---

[7] The most Stokes was able to produce was the testimony of council members that they had no evidence to support certain alleged defamatory statements made in the committee meeting. For example, in his deposition, McCall replied, "No" when asked if he was aware of any "written evidence of a sweet deal going." Cammick was asked the same question in her deposition, and she replied, "No."

> Q. Can you explain that to me?
>
> A. We['re] getting -- this is regarding the metal carports, and it came up, [we] got complaints from different people selling carports. First off, *you take it with a grain of salt*, maybe, you know, this, that and the other.

(emphasis added). Perhaps McCall should have investigated to verify the truth of these complaints. Yet, given the very high standard our courts have imposed for a conclusion that a defendant showed reckless disregard for the truth, this testimony is less than clear and convincing. *See Elder*, 341 S.C. at 114, 533 S.E.2d at 902 ("It is insufficient to show the defendant . . . simply failed to investigate or verify information; there must be evidence at least that the defendant *purposefully avoided the truth*." (emphasis added)).

Based on the foregoing, we affirm the circuit court's order granting summary judgment to McCall and Cammick.

## II. Motion to Amend

Stokes also argues the circuit court erred by declining to allow him to amend his complaint to assert claims against McCall and Cammick in their individual capacities. However, given Stokes's failure to produce sufficient evidence on at least two elements of his slander per se claim, any amendment to his complaint would be clearly futile. *See Hansson*, 374 S.C. at 357, 650 S.E.2d at 71 (holding that Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case[] and on which that party will bear the burden of proof.").

Therefore, we affirm the circuit court's denial of the motion to amend on this ground. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal."); *Skydive Myrtle Beach, Inc. v. Horry Cnty.*, 426 S.C. 175, 182, 826 S.E.2d 585, 589 (2019) ("[A] trial court may deny a motion to amend if the amendment would be clearly futile."). We express no opinion on the circuit court's own reasons for concluding that the amendment would be futile.

## III. Motion to Quash

Stokes contends the circuit court erred by quashing the deposition subpoena served on Moulder because "the overwhelming consensus in other jurisdictions is that '[t]he same person may be deposed as a fact witness and a corporate representative in separate depositions.'" We decline to address this assignment of error because the order quashing the subpoena is not immediately appealable.

Section 14-3-330 of the South Carolina Code (2017) provides for appellate jurisdiction over the following:

> (1) Any intermediate judgment, order or decree in a law case *involving the merits* in actions commenced in the court of common pleas and general sessions, brought there by original process or removed there from any inferior court or jurisdiction, and final judgments in such actions; provided, that if no appeal be taken until final judgment is entered the court may upon appeal from such final judgment review any intermediate order or decree necessarily affecting the judgment not before appealed from;
>
> (2) An order *affecting a substantial right* made in an action when such order (a) in effect determines the action and prevents a judgment from which an appeal might be taken or discontinues the action, (b) grants or refuses a new trial[,] or (c) strikes out an answer or any part thereof or any pleading in any action;
>
> (3) A final order affecting a substantial right made in any special proceeding or upon a summary application in any action after judgment; and
>
> (4) An interlocutory order or decree in a court of common pleas granting, continuing, modifying, or refusing an injunction or granting, continuing, modifying, or refusing the appointment of a receiver.

(emphases added).

In *Ex parte Wilson*, our supreme court held that an order quashing a subpoena duces tecum served on a non-party prior to the commencement of proceedings to

enforce a judgment "neither involve[d] the merits nor affect[ed] a substantial right" and was, therefore, not immediately appealable. 367 S.C. 7, 13–14, 625 S.E.2d 205, 208 (2005). However, in the interest of judicial economy, the court addressed the novel issue of whether " post-judgment discovery may be properly conducted under Rule 69, SCRCP, without the issuance of a writ of execution or the commencement of supplementary proceedings." *Id.* at 14, 625 S.E.2d at 208.

Further, "[c]ourts have made a practice of accepting appeals of denials of interlocutory orders not ordinarily immediately appealable when these appeals are companion to issues that are reviewable." *Brown v. Cnty. of Berkeley*, 366 S.C. 354, 362 n.5, 622 S.E.2d 533, 538 n.5 (2005). Yet, in *Brown*, the court declined to address the denial of a motion to dismiss certain claims, which was considered interlocutory, because the issue "lack[ed] a sufficient nexus or companionship" to the appealable issue, in that case, the denial of a preliminary injunction preventing a special audit, to justify the court's exercise of immediate review. *Id.*

Here, the circuit court's ruling quashing the subpoena served on Moulder does not have a sufficient nexus to either the granting of summary judgment for McCall and Cammick or the denial of Stokes's motion to amend. Further, issue novelty does not compel the panel to address the issue in the interest of judicial economy. Although Stokes claims there are no published opinions by a South Carolina appellate court concerning this issue, the County does not dispute the permissibility of two separate depositions for the same person as a fact witness and a corporate representative, respectively. Rather, the County sought to quash the subpoena on the ground that Stokes had already questioned Moulder in both capacities during the 30(b)(6) deposition.[8]

Based on the foregoing, we decline to address this issue because it is "not presently subject to appellate review." *Brown*, 366 S.C. at 362, 622 S.E.2d at 538.

## CONCLUSION

Accordingly, we affirm the circuit court's rulings granting summary judgment to McCall and Cammick and denying the motion to amend the complaint. We

---

[8] The County asserted the additional ground of attorney-client privilege. The County argued that its attorney spoke with Moulder "on behalf of [the] County, who was his employer, and therefore that privilege attache[d] throughout the entire lawsuit." The circuit court rejected this argument.

decline to address the circuit court's order quashing the subpoena Stokes served on Moulder.

**AFFIRMED.**

**WILLIAMS, C.J., and VERDIN, J., concur.**

## ADDENDUM I

MR. MCCALL:

[O]ne of the other things I want to bring up is the Building Codes Department. All of us [are] getting complaints. . . . [T]he last Easter weekend, let's make specific instances. . . . I get a call. Well, we're set up to pour a footing, a foundation, and the [b]uilding [i]nspector shows up and the concrete truck says he's going to be an hour late. Well, he said, "I ain't waiting. I'm leaving. You just reschedule for Monday." Well, these people call me about it. I say "Ah, golly." So I can't get . . . a hold, so I call Katie. . . . So finally she got a hold of [Cammick] and [Cammick] investigated. Well, the guy – [Cammick] called the head of the Building Codes and the excuse was, and [Cammick] was right, it's a lame excuse. "I had a flat tire." Even Mr. Moore said, "My 14 year-old kid can change a tire." Or is he – he just wanted – didn't want to drive that only vehicle. That vehicle just – he said, "What was going on here?"

The Building Codes. Now, here's what I'm getting into. They -- I said, "Well, I've talked to plumbers, electricians, everybody." I said, "Why don't you complain? Why don't you go to the Administrator? I don't handle personnel policy. I don't -- you know, it's not my job." He said, "Well, if you complain they will come after you. You'll never get another inspection again." I talked to a plumber today at lunch. He said, "No, I'm not saying a word 'cause you make them mad they will make life miserable for you." They don't -- Oconee County, you're on the phone

with one of the electricians. We don't even follow the National Electric Code. It's -- it's like we make up the rules as we go and -- and I asked Mr. Moore for a cost-benefit analysis of Building Codes, and I'm going to get into this a little bit further. Are they -- are they just here to embarrass the entire Council? Are they -- are they making up the rules or is this a power play that they're instituting? They're -- they're -- they forget they work for the people of Oconee County. The people of Oconee County. The builders don't work for them. They have to be available for the builder because they serve the building community.

The next thing: carports and car sheds are temporary structures. They -- they're not -- you buy them. It's like buying a tent or whatever. It ain't permanent. After about three or four years you'll find out how not permanent they are 'cause they fall apart. Well, they . . . got a sweet deal going. They're recommending that you've got to go down to a certain other builder or seller of carports and sheds and he's the only person that can stamp the drawings. I asked Mr. Moore, I said, "Well, why don't you go to the Board of Licenses in South Carolina and find out whether this guy has got a PE number. He's claiming to be a structural engineer." As of this meeting, no such number exists. I'm looking for some papers right now, but Building Codes is . . . funneling people down to his office. And I see Mr. Lee is out in the hall. He was going to lend some comments. He's -- he' s over the Realtor, represents the Realtor's Association. Somebody tell him to get in here and get off the phone.

. . .

But this is -- this is -- it's embarrassing for us that are elected because the people elected us and then . . . these Building Codes is -- is making up rules. Not serving. They -- they say, "Well, you've got to -- you just have to reschedule." Well, heck, if the concrete truck is on the way you can't stop time, tide, or the guy driving the concrete truck. You -- you can't do it. You're going to pay

for that concrete regardless. And there's no reason. It's not Scott's problem for being out of town. He was out of town on legitimate vacation.

MR. MOORE:[9]

But if he's got ten more inspections lined up for the rest of that day and one scheduled for a certain time immediately following that one, and he's now going to wait around for an hour and miss the next one, then that contractor is going to be mad because he missed that one. So it does make it difficult sometimes to just completely accommodate the needs of a particular time.

MR. MCCALL:

I mean --

MR. MOORE:

Again, I don't know the specifics of that one. I'm just speaking in general terms.

MR. MCCALL:

Well, Edda could tell you what the excuse was. . . . .

. . . .

MS. CAMMICK:

I had -- as you know I had built one of those carports. And I know for a fact that the Building Codes Department discourages you from buying from certain people and encourage you -- encourages you to buy from others. But my bigger problem was the Assessor showed up at my property today and he said, "what am I doing here? This

_____

[9] We believe the speaker identified as "Mr. Moore" was actually Scott Moulder, the County's Administrator.

isn't a permanent structure. We're not -- you know, this -- this isn't going to be included in your assessment." And we said to him, "Oh, well, but since you're here we knocked down our deck so can you go back and re-measure this stuff because I know nobody came out for that." So he did. He went through the entire property and -- and kind of redid everything. But the thing he came for he -- he alleged that he didn't need to be there for that particular.

MR. MCCALL:

So they sold Ms. Cammick a building permit.

MS. CAMMICK:

Well, that's what -- you know, I don't mind but we need to streamline that process as well for a pre-engineered structure like that.

UNKNOWN COUNCIL MEMBER:

Madam chair, if I may, are we under Strategic Planning Meeting Summary & Discussion?

MS. CAMMICK:

We are, but one of the things we were talking about is government is slow to act in this kind of --

UNKNOWN COUNCIL MEMBER:

Okay.

MS. CAMMICK:

It's part of that discussion in a way. It's issues that have come up that need to be addressed to make -- or to either streamline our work or make it more efficient.

MR. MCCALL:

Ms. Cammick?

MS. CAMMICK:

Uh-huh.

MR. MCCALL:

Could I get Mr. Lee to come up here?

MS. CAMMICK:

Quickly.

MR. MCCALL:

Come on up here.

. . . .

MR. LEE:

So I was outside.  What am I talking about?

MR. MCCALL:

Well, the same thing we were talking about this morning, not the (inaudible) house, but the other thing.

MR. LEE:

Uh- huh.

MR. MCCALL:

Building Codes.

MR. LEE:

Okay.  What specifically?

MR. MCCALL:

Tell me your take on it.

MR. LEE:

There's -- in the past talking to multiple builders there's a -- they do get slowed down frequently with -- with the permitting process and the unavailability of – of inspectors.

MS. CAMMICK:

Okay.  So that's your two major concerns?

MR. LEE:

Yeah.

MS. CAMMICK:

All right.

MR . LEE:

That's -- that's the conversation that we've had with -- with multiple ones.

MS. CAMMICIK:

Okay. Thank you.

MR . MCCALL:

All right.  That's it.

. . . .

MS. CAMMICK:

All right.  I think Mr. Moulder gets the general idea that that Department needs some work.  Okay.

## ADDENDUM II

**Oconee, building codes director part ways**

Posted on April 28, 2017

**By Steven Bradley**

The Journal

WALHALLA – Oconee County is in the market for a new building codes director, as county administrator Scott Moulder confirmed Friday that David Stokes[,] who previously held the role[,] is no longer employed with the county[.]

Scott Carroll has been asked to serve as interim director until a formal replacement can be found[,] Moulder told The Journal[.]

The change comes just days after a meeting of county council's budget committee in which members delivered sharp criticism of the department[.]

Councilman Wayne McCall said he'd received numerous complaints from those who dealt with the Building Codes Department about preferential treatment being given to certain contractors over others[.]

"I talked to a plumber today and he said 'If you make them mad[,] they will make life miserable for you,'" he said[.]

"Are they just here to embarrass the entire council?  Are they making up the rules?  Is this a power play that they're instituting?  They forget that they work for the people of Oconee County[.]  The builders don't work for them[.]  They have to be available for the builders because they serve the building community[,]" McCall added[.]

McCall also alleged that the Building Codes Department "had a sweet deal going" in which staff would recommend that the public had to use "a certain other builder of carports and sheds, and (that builder is) the only person that can stamp the drawings[.]"

But McCall said the county had not been able to confirm that the builder in question was a licensed professional engineer but that "building codes is funneling people down to his office[.]"

"It's embarrassing for us that are elected because the people elected us and Building Codes is making up rules and not serving (the public)[,]" he said[.]

Council chairwoman Edda Cammick also weighed in[,] saying that she had recently built "one of those carports" that McCall had referred to and verified his claims[.]

"I know for a fact that the Building Codes Department discourages you from buying from certain people and encourages you to buy from others[,]" she said[.] "But my bigger problem is the assessor showed up at my property (Tuesday) and he said, "What am I doing here? This isn't a permanent structure? This isn't going to be included in your assessment[.]"

McCall pointed out the impact[.] "So they sold Mrs. Cammick a building permit[.]"

She replied[,] "I don't mind but we need to streamline that process as well for a pre-engineered structure like that[.]"

"I think Mr[.] Moulder gets the general idea that that department needs some work[,]" Cammick concluded[.]

sbradley@upstatetoday.com